(No. 71304.—

JAE BOON LEE, Adm'x of the Estate of Sang Yeul Lee, Deceased, Appellant, v. THE CHICAGO TRANSIT AUTHORITY, Appellee.

*Opinion filed October 22, 1992.—Rehearing denied December 7, 1992.*

434

440

BILANDIC, J., took no part.
MORAN and HEIPLE, JJ., dissenting.

William J. Harte, Ltd. (William J. Harte and Erik D. Gruber, of counsel), and Fishman & Fishman & Saltzberg, P.C. (Michael F. Maloney, Michael Barone and Clifford Gately, of counsel), all of Chicago, for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Ruth E. VanDemark, Stanley V. Boychuck and George J. Brown, of counsel), for appellee.

Todd A. Smith, of Corboy & Demetrio, P.C., of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

Peter C. John and Mary Patricia Benz, of Pope & John, Ltd., of Chicago, for *amicus curiae* Commonwealth Edison Co.

Charles H. Cole, of Cole, Grasso, Fencl & Skinner, Ltd., of Chicago, for *amicus curiae* Illinois Association of Defense Trial Counsel.

Stephen J. Mattson and Lee Ann Conti, of Mayer, Brown & Platt, of Chicago, for *amicus curiae* Illinois Telephone Association.

Lord, Bissell & Brook, of Chicago (Hugh C. Griffin, Thomas J. Healey and David R. Schmidt, of counsel), for *amicus curiae* Illinois Railroad Association.

Coffield, Ungaretti & Harris, of Chicago (J. Timothy Eaton, of counsel), for *amicus curiae* State Farm Fire & Casualty Co.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Jae Boon Lee, administratrix of the estate of Sang Yeul Lee, brought a wrongful death action in

the circuit court of Cook County against defendant, Chicago Transit Authority (CTA), to recover damages for the death of her husband, who was electrocuted while on land owned by the CTA. Count I of plaintiff's fourth-amended complaint alleged that the CTA was negligent in failing to guard and warn of the existence of its street-level electrified third rail; count II alleged willful and wanton conduct. The jury returned a verdict in the amount of $3 million for plaintiff on the negligence count, but reduced the award by 50% based on decedent's own negligence.

The CTA appealed, contending that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict; that insufficient and improper evidence and trial error compelled a new trial; and that the jury's apportionment of fault and award of damages were not supported by the evidence. The appellate court reversed (205 Ill. App. 3d 163), and entered judgment in favor of the CTA. This court granted plaintiff's petition for leave to appeal (134 Ill. 2d R. 315).

The Illinois Trial Lawyers Association, the Illinois Association of Defense Trial Counsel, and Commonwealth Edison have filed briefs as *amici curiae*. The Illinois Trial Lawyers Association urges this court to affirm the trial court's decision; the Illinois Association of Defense Trial Counsel and Commonwealth Edison urge us to affirm the decision of the appellate court.

The issue presented for review is whether the jury was properly instructed that the CTA owed a duty of ordinary care to the decedent. We hold that the CTA did owe such a duty. Accordingly, we reverse.

## FACTS

The following facts were adduced at trial. Plaintiff's decedent, Sang Yeul Lee (Lee), a 46-year-old Korean im-

migrant who was unable to read English, attended a party on the evening of October 21, 1977. On his way home, Lee entered a CTA right-of-way at the intersection of Kedzie Avenue and the Ravenswood railway line in Chicago, apparently, in order to urinate. The right-of-way was posted with signs, placed on a utility shed and on sawhorses at each side of the tracks, warning "Danger," "Keep Out," and "Electric Current." Parallel to the tracks and approximately 6½ feet from the sidewalk lay a street-level third rail. The purpose of the rail, which carried 600 volts of electricity, was to supply power to trains as they passed through the street-level crossing. The CTA had laid uneven-edged boards, about six inches apart, called "jaws" on its right-of-way next to the sidewalk in order to make pedestrians aware that they were not meant to walk in that area. The uneven surface of the boards, also known as "cattle boards," makes it impossible for cattle and difficult for persons to walk atop them. The "jaws" at Kedzie Avenue extended between the end of the third rail and the sidewalk and were also placed on either side of the rail and between the tracks. Lee, whose blood-alcohol level of 0.341 placed him in the "stupor" classification of intoxication, made contact with the third rail and suffered fatal injuries. Thomas Wolgemuth, manager of facilities engineering and maintenance for the CTA, testified that Lee was neither permitted nor invited to be on the Kedzie Avenue CTA tracks at the time of his death. Plaintiff did not rebut this testimony.

Wolgemuth further testified that there are 19 grade, or street-level, crossings on the CTA transit lines where trains are powered by a third rail. At two of the grade crossings, located at Maple and Isabella Streets in Wilmette, the CTA installed safety measures consisting of automatic chain link fence-type gates across the track when the line was converted from overhead to third rail

power in 1973. Before installing the "jaws" trespass system on the Ravenswood line in 1976, the CTA considered three alternative protective systems: gates such as those at the Wilmette grade crossings, which would remain closed except when a train was in the station; boards, which would cover the third rail on all but the train side; and catenary lines, which would carry the electric current overhead.

Plaintiff introduced evidence of 10 prior accidents which occurred between 1948 and 1975 on the 3.2-mile segment of track where the CTA's third rail runs at grade level. One of the accidents occurred at the Ravenswood/Kedzie crossing in 1974, when a youth fell from a fence he was scaling onto the rail. The CTA offered to stipulate that it had notice of the accidents on that section of its line prior to 1977. Plaintiff, however, refused the stipulation. The CTA also presented evidence that there were no accidents on the section between July 1976, when it installed the "jaws," and October 1977, when Lee was electrocuted.

Charles Heilman, plaintiff's expert witness, testified that the segment of track in question is the only one in the United States or Canada where an electrically charged grade-level third rail is unguarded, uncovered or unfenced.

At the completion of testimony, the parties tendered instructions to the court. Plaintiff's instruction, Illinois Pattern Jury Instructions, Civil, No. 120.03 (2d ed. 1971) (IPI Civil 2d No. 120.03), was based on the theory that at the time of the accident, the CTA was engaged in the activity of conducting electricity. The CTA objected to the submission of this instruction, tendering in its stead IPI Civil 2d No. 120.02, reflecting the CTA's position that the electrified third rail was a condition, not an activity, on the land. Finding, however, that the CTA was engaged in the activity of conducting electricity, the

court rejected the CTA's instruction, and instructed the jury in accordance with IPI Civil 2d No. 120.03.

The court specifically instructed the jury that "the C.T.A. owes the trespasser no duty unless his presence on the tracks should have been reasonably anticipated, then the C.T.A. owes him the duty not to willfully or wantonly cause him injury. The C.T.A. was under a duty not to [injure] Sam [sic] Yeul Lee, however, if the C.T.A. knows or to facts known to it should reasonably anticipate the presence of Sam Yeoul [sic] Lee in the place of danger, it is then under the duty to use ordinary care not to injury [sic] Sam Yeoul [sic] Lee."

Following deliberations, the jury found that the CTA had breached its duty of care and was thus negligent. In response to a special interrogatory, the jury also found that the CTA's conduct was not willful or wanton. The jury returned a verdict for plaintiff which was proportionately reduced to reflect decedent's own negligence.

On appeal, the appellate court held that the trial court improperly gave the jury IPI Civil 2d No. 120.03, which states a landowner's duty of ordinary care to an anticipated trespasser when that trespasser is injured by an *activity* on the land. Rather, according to the appellate court, the trial court should have instructed the jury according to IPI Civil 2d No. 120.02, which states the duty of the landowner to refrain from willful and wanton conduct towards a trespasser who is injured by a *condition* on the land. Because the jury had specifically found that the CTA's conduct was not willful or wanton, the appellate court reversed without remanding for a new trial.

## DISCUSSION

### Negligence

Traditionally, the liability of a landowner in Illinois has been delineated in terms of the duty owed to per-

sons present on the land. Whether a duty exists is a question of law for the court to determine. (*Gouge v. Central Illinois Public Service Co.* (1991), 144 Ill. 2d 535, 542.) Courts have found the duty of a landowner to vary according to whether the entrant on the landowner's property was classified as an invitee, a licensee or a trespasser, with the greatest care due to the invitee and the least to the licensee or trespasser. However, in 1984, the Premises Liability Act (Act) (Ill. Rev. Stat. 1991, ch. 80, par. 301 *et seq.*) abolished the common law distinction between invitees and licensees. Section 2 of the Act states that "[t]he duty owed to such entrants is that of reasonable care under the circumstances regarding the state of the premises or acts done or omitted on them." Because the Act is not retroactive, and because plaintiff does not dispute that Lee was a trespasser at the time of his death, we consider the Act only insofar as it reaffirms the views of the legislature concerning trespassers. Section 3 of the Act states unequivocally that "[n]othing herein affects the law as regards any category of trespasser." Ill. Rev. Stat. 1991, ch. 80, par. 303.

Generally, the rule in Illinois is that a landowner owes a trespasser only the duty to refrain from willfully or wantonly injuring him. (*Marcovitz v. Hergenrether* (1922), 302 Ill. 162, 167; *Votava v. Material Service Corp.* (1979), 74 Ill. App. 3d 208, 212.) However, as is the case with most rules, certain exceptions to that rule have evolved.

This court has long recognized that a landowner must use ordinary care to avoid injury to the trespasser who has been discovered in a place of danger on the premises. (*Briney v. Illinois Central R.R. Co.* (1948), 401 Ill. 181, 186; *Neice v. Chicago & Alton R.R. Co.* (1912), 254 Ill. 595, 603; *Illinois Central R.R. Co. v. Eicher* (1903), 202 Ill. 556, 560.) Courts have also found that the land-

owner owes a duty of ordinary care to those who are frequent trespassers in a limited area where the landowner knows or should know of their constant intrusion. (*Bernier v. Illinois Central R.R. Co.* (1921), 296 Ill. 464, 471; Restatement (Second) of Torts §334 (1965).) Finally, an exception has been recognized where small children foreseeably intrude on the premises and are incapable of appreciating the risk involved. In such cases, the landowner must exercise due care to remedy the dangerous condition or otherwise protect the children from injury resulting from it. (*Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 625.) None of these exceptions, however, apply to the case before us.

In this appeal, plaintiff advances six separate approaches, any one of which, she maintains, supports the imposition of a duty on the CTA. We rely, for disposition of this matter, upon only one of plaintiff's theories. Thus, we need not recite or analyze each of the several theories advanced.

We note in passing, however, that one approach advanced by plaintiff is the abolition of the traditional distinctions between statuses of persons on the land with the same duty of care imposed for trespassers and non-trespassers alike. Plaintiff's argument in support of abolishment of the classifications is both extensive and compelling. However, the legislature's recent iteration on the licensee/invitee classification and its determination to leave intact the common law rule concerning trespassers (see Ill. Rev. Stat. 1991, ch. 80, par. 301 *et seq.*) persuades us that society yet finds some benefit in retaining the trespasser classification. Thus, we continue to decline abolition of the classifications. See *Pashinian v. Hartinoff* (1980), 81 Ill. 2d 377, 380-81.

We find compelling, however, plaintiff's invitation to adopt section 337 of the Restatement (Second) of Torts as an additional exception to the trespasser rule. Relying

on section 337, plaintiff urges this court to hold that, if a landowner knows of or reasonably anticipates the presence of a trespasser in a place of danger, the landowner should be held to a duty of ordinary care to protect and/or warn the trespasser. The CTA maintains that even if section 337 applied, plaintiff could not prevail because there was "no duty, no breach of duty, and no proximate causation."

Section 337 of the Restatement, entitled "Artificial Conditions Highly Dangerous to Known Trespassers," provides:

"A possessor of land who maintains on the land an artificial condition which involves a risk of death or serious bodily harm to persons coming in contact with it, is subject to liability for bodily harm caused to trespassers by his failure to exercise reasonable care to warn them of the condition if

(a) the possessor knows or has reason to know of their presence in dangerous proximity to the condition, and

(b) the condition is of such a nature that he has reason to believe that the trespasser will not discover it or realize the risk involved." Restatement (Second) of Torts §337, at 195 (1965).

In order to establish a duty under section 337, the trespasser must first show that the landowner knew or had reason to know of the trespasser's presence. The phrase "reason to know" is defined in section 12 of the Restatement to mean that the possessor of land has information from which a person of reasonable intelligence, or of the superior intelligence of the actor, would infer that the fact in question exists, or would govern his conduct upon the assumption that it does exist. Restatement (Second) of Torts §12, at 19 (1965).

In satisfaction of the knowledge requirement, plaintiff relies on the CTA's stipulation that it could "reasonably anticipate" persons contacting the grade-level third rail. The CTA denies that it so stipulated, contending, in-

stead, that it stipulated only to notice of the prior incidents.

We believe that the record belies any claim by the CTA that it did not stipulate to reasonable anticipation. During plaintiff's examination of Thomas Boyle, the head of the CTA's safety department, the following colloquy occurred:

"MR. MALONEY [Plaintiff's Attorney]: Sir, would it be fair for me to say that CTA could reasonably anticipate people were contacting the third rail as it was at grade level and being killed or seriously injured before 1977?

MR. BOYCHUCK [Defense Attorney]: We object. We have never denied that the CTA was aware of this—this was gone over before the jury and on a number of occasions now. And I believe that it is just being—improper at this point.

MR. MALONEY: May we have a stipulation now then, too, that the answer to my question is 'yes'?

THE COURT: I'll let the—

MR. BOYCHUCK: Your Honor, I offered a stipulation before as to the notice of each of those incidents.

MR. MALONEY: I'm sorry. I mean the way my question is phrased. Would you stipulate to the answer to that is 'yes'?

MR. BOYCHUCK: Yes.

THE COURT: Proceed.

MR. MALONEY: And you had that reasonable anticipation as of October 22, '77 and before that, is that fair?

WITNESS: The anticipation, sir, that somebody—

MR. MALONEY: What Mr. Boychuck just stipulated to, you had that knowledge as of October '77, didn't you?

WITNESS: Yes, sir. I believe that is one of the reasons—

MR. MALONEY: Is the answer 'yes'?

WITNESS: —that the barriers were put in, yes."

On three subsequent occasions during examination of various witnesses, Maloney, in phrasing his interrogatories, stated that the CTA had stipulated that it could rea-

sonably anticipate persons coming into contact with the third rail at grade level prior to October of 1977. Maloney repeated the stipulation during his closing argument to the jury.

At no time did defense counsel object as to the correctness of Maloney's characterization of the stipulation. The evidence which the jury heard was that the CTA stipulated to reasonable anticipation. Regardless of its intent, the CTA cannot now contend that its stipulation was, instead, to notice.

Moreover, plaintiff presented evidence at trial of 10 prior accidents which occurred between 1948 and 1975 on the 3.2-mile segment of track where the CTA's third rail ran at grade level. Even had there been no stipulation to reasonable anticipation, a finding of reasonable anticipation could properly be supported by evidence of the CTA's knowledge of the prior accidents.

The CTA maintains, however, that comment *a* to section 337 renders that provision inapplicable in this case because, as the comment makes clear, section 337 requires "foreseeability in fact." Comment *a* to section 337 states that "[t]he rule *** relates only to the conditions under which a possessor of land is subject to liability to a trespasser whom he knows *to be about to* come in contact with a highly ·dangerous artificial condition maintained by him upon the land." (Emphasis added.) (Restatement (Second) of Torts §337, Comment *a*, at 195 (1965).) Our research has yielded only a few cases which have considered the applicability of section 337. In *Johnson v. Rinker Materials, Inc.* (Fla. App. 1988), 520 So. 2d 684, *Payne v. M. Greenberg Construction* (1981), 130 Ariz. 338, 636 P.2d 116, and *Martin v. Jones* (1953), 122 Utah 597, 253 P.2d 359, the courts strictly interpreted the phrase "about to" in comment ·*a* and thereby found section 337 inapplicable. However, the Arizona Supreme Court, in *Webster v. Culbertson* (1988), 158 Ariz. 159,

761 P.2d 1063, recently applied section 337 and implicitly rejected comment *a* as a constraint on the applicability of the provision.

In *Webster*, the defendant bought a parcel of property and erected a barbed wire fence to keep out trespassers who were crossing her property. The fence crossed over a "wash" that the defendant knew was used for recreational purposes. An equestrian trail crossed the wash less than 14 yards from where the wash entered the defendant's property. The fence was not plainly visible, and the defendant had not posted warnings of its existence. Evidence in the record indicated that footprints, hoofprints and tire tracks were plainly visible in the wash.

The plaintiff, Webster, was injured when he rode his horse into the barbed wire fence. The defendant asserted that she had no reason to know of the plaintiff's proximity to the fence and, therefore, should not be held liable for the plaintiff's injuries. The Arizona Supreme Court rejected the defendant's argument that she had no reason to know of the plaintiff's presence. In essence, the court placed a duty to warn on a person who maintains a dangerous artificial condition when the person is aware of the possibility that others will come into dangerous proximity of the condition.

We agree with the Arizona court's application of section 337 of the Restatement. In the case before us, the third rail is located a mere 6½ feet from the public sidewalk, which is adjacent to a busy city street. The CTA knew that pedestrians used the sidewalk to cross the tracks, and certainly that pedestrians gained access thereby to those tracks. Thus, the CTA was aware that such persons could possibly come into dangerous proximity with the third rail. Therefore, we find that the CTA had "reason to know" of the presence of pedestrians

upon its tracks. Restatement (Second) of Torts §337(a) (1967).

In applying section 337, we must also determine whether the third rail was of such a nature that the CTA had reason to believe that a trespasser would not discover it. At the time of the decedent's injuries, the warnings at the Ravenswood crossing indicated only that there was danger and that there was electric current. There was nothing which indicated either the existence or the location of the third rail, or that the electric current was carried in a rail. There were no markings on the third rail itself. Significantly, George Millonas, the CTA's director of plant maintenance, testified that the CTA trained its employees to recognize and to work around the rail. These facts amply support a finding that CTA had reason to believe that a trespasser would not discover the third rail.

We find that the requirements of section 337 have been satisfied. Thus, we hold that the CTA owed plaintiff's decedent a duty of ordinary care to properly warn of the third rail.

We recognize that our holding today represents a slight departure from the traditional rule regarding the duty owed to trespassers. However, "[i]n the choice of competing considerations of societal policy, the need for protection against the reasonably foreseeable risk of death or severe personal injury outweighs the freedom of action that would otherwise characterize the relation of the possessor of land to a trespasser." (*Imre v. Riegel Paper Corp.* (1957), 24 N.J. 438, 448-49, 132 A.2d 505, 510.) Our determination of the existence of a duty here, we believe, is properly reflective of the prevailing social policies.

Moreover, the legal concept of duty is not sacrosanct in itself. (*Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348, 356.) Though the existence of a legal duty is or-

dinarily considered in terms of foreseeability of injury, the question of whether a legal duty exists is contingent upon a variety of factors. (*Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 526.) Considerations such as the likelihood of injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden upon the defendant must be taken into account. (*Deibert v. Bauer Brothers Construction Co.* (1990), 141 Ill. 2d 430, 438; *Illinois Housing Development Authority v. Sjostrom & Sons, Inc.* (1982), 105 Ill. App. 3d 247, 261-62.) Thus, duty is no more than an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. *Nelson v. Commonwealth Edison Co.* (1984), 124 Ill. App. 3d 655, 662.

Here, the close proximity of the third rail to the sidewalk significantly increased the likelihood of injury to pedestrians who used the sidewalk. At trial, the CTA presented evidence that alternate means of guarding the right-of-way against pedestrian entry could be problematic to install and maintain. That notwithstanding, we believe that the risk of serious injury or death to a pedestrian as a result of contact with a third rail located at grade level, in close proximity to a sidewalk, outweighs any burdens associated with more formidable safeguards or, at the least, adequate warning.

The CTA maintains, however, that even if section 337 may be relied upon to impose a duty to warn, there was no breach of that duty, and further, there was no proximate cause. The CTA points out that there were "no fewer than five warning signs on the east side of Kedzie" at the time of the incident. The CTA maintains that "[l]egally, those signs were adequate, but that their adequacy is irrelevant because plaintiff's decedent's alcohol

level rendered him incapable of reading or understanding any sign."

Initially, we note that the CTA is not relieved of its duty because of the decedent's diminished capacity. Notwithstanding the decedent's condition or level of mental functioning at the time he sustained injury, the CTA owed a duty to adequately warn of the dangers of the third rail. The decedent's intoxication was properly a consideration only with respect to his contributory negligence.

Questions concerning breach of a duty and proximate cause are factual matters for the jury to decide. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 156; *French v. City of Springfield* (1976), 65 Ill. 2d 74, 79; *Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 84.) A jury's determination will not be set aside unless, clearly, it is not supported by the evidence.

The jury returned a general verdict in which it found, *inter alia*, that the CTA "failed to adequately warn of electricity in its third rail." Of the five warning signs posted at the crossing, not one warning indicated the presence of the third rail. Additionally, as we have previously stated, the third rail was not marked, nor was there any indication that the electric current, of which the posted signs warned, was carried in any of the grade-level rails. Regardless of the CTA's belief that the signs were legally adequate, the jury apparently believed otherwise.

The CTA makes much of the fact that, in addition to the posted warning signs, it had installed "jaws" adjacent to the sidewalk, which would alert someone attempting to traverse the "jaws" that he was in a prohibited area. Though the "jaws" may, in fact, serve that purpose, they nevertheless did not warn of the third rail's existence or dangerousness. The evidence adequately supports the jury's finding that the CTA

breached its duty to adequately warn of electricity in its third rail.

The term "proximate cause" describes two distinct requirements: cause in fact and legal cause, which is a policy decision that limits how far a defendant's legal responsibility should be extended for conduct that, in fact, caused the harm. (*McCoy v. McCoy* (1992), 227 Ill. App. 3d 244, 248; see also M. Polelle & B. Ottley, Illinois Tort Law 413-18 (1985).) The CTA summarily concludes, without reference to either of the two requirements, that proximate cause was not proved. We deem it appropriate to consider both requirements.

Cause in fact can only be established when there is a reasonable certainty that a defendant's acts caused the injury or damage. Under the substantial factor test, the defendant's conduct is a factual cause of the plaintiff's injury if the conduct was a material element and a substantial factor in bringing about the injury. (*McCoy*, 227 Ill. App. 3d at 248; W. Keeton, Prosser & Keeton on Torts §41, at 267 (5th ed. 1984).) Where reasonable minds could differ, whether the defendant's conduct was of such a substantial factor in bringing about the plaintiff's injury is for the jury to decide. (W. Keeton, Prosser & Keeton on Torts §41, at 267 (5th ed. 1984).) It is axiomatic that liability cannot be premised merely upon surmise or conjecture as to the cause of the injury.

Here, the CTA failed to adequately warn that its third rail transmitted 600 volts of electric current. In addition to that fact, plaintiff's decedent was intoxicated to a degree which placed him at the "stupor" level of intoxication. Yet we cannot conclude that plaintiff's decedent's injuries would have occurred without the CTA's failure to adequately warn of the electric current in the rail. Significantly, plaintiff's decedent apparently had the presence of mind to seek the privacy and shelter of the surrounding buildings at the crossing before relieving

himself. We do not find the jury's finding on cause in fact so palpably erroneous as to warrant a different result.

Legal cause "is essentially a question of foreseeability: a negligent act is a proximate cause of an injury if the injury is of a type which a reasonable man would see as a likely result of his conduct." (See *Masotti v. Console* (1990), 195 Ill. App. 3d 838, 845.) Thus, an injury will be found not to be within the scope of the defendant's duty if it appears "highly extraordinary" that the breach of the duty should have caused the particular injury. Restatement (Second) of Torts §435(2), at 449 (1965).

The mere fact that the CTA placed several warning signs at the crossing supports a finding that it was foreseeable that serious injury or death would result from a failure to warn of the danger. Thus, it was likewise foreseeable that injury would result if the warnings were inadequate. Accordingly, we find no error in the jury's finding of legal causation.

In sum, given the close proximity of the grade-level third rail to the pedestrian sidewalk, the failure of the CTA to warn of the presence, location and danger of the third rail, along with the fact that plaintiff's decedent would not likely discover the danger, the CTA owed plaintiff's decedent a duty to adequately warn of the danger. The CTA breached its duty by failing to warn of the presence and location of the third rail, and that the electric current warned of was transmitted via that rail. Finally, the CTA's failure to adequately warn of the electric current in the third rail was a proximate cause of plaintiff's decedent's injuries. Thus, the jury instruction, though premised on the theory that the CTA was engaged in an activity, correctly instructed the jury that the CTA owed plaintiff's decedent a reasonable duty of care.

## Alleged Trial Errors

The CTA challenges the jury's verdict in several other respects. As its major contention, the CTA argues that improper and insufficient evidence and prejudicial error compelled the entry of judgment notwithstanding the verdict or the granting of a new trial.

Under the standard announced in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, a directed verdict or judgment notwithstanding the verdict should be granted only where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. For the reasons which follow, we find that the *Pedrick* standard has not been met.

The CTA posits three arguments in support of its claim of improper and insufficient evidence. The CTA first argues that the trial court improperly permitted plaintiff to present evidence of prior incidents to establish that the third rail was unreasonably dangerous. The CTA maintains that notwithstanding plaintiff's attorney's protestations to the contrary, evidence of prior third rail incidents was used at trial as evidence that the condition of the third rail was unreasonably dangerous. The CTA asserts that such evidence was admissible for that purpose only upon a showing of substantial similarity. Because plaintiff did not lay a foundation showing that the prior incidents were substantially similar, it was error for this evidence to be presented to prove that the rail was unreasonably dangerous.

The CTA's claimed error is not supported by the record. Although it may have been plaintiff's hope that the evidence of prior incidents would be considered by the jury for the purpose of showing the dangerousness of the rail, the record reveals that the trial court did not

permit its use for that purpose. During the course of trial, defense counsel tendered to the court a limiting instruction regarding the use of the evidence of the prior incidents. The court subsequently instructed the jury that the evidence of reports received by the CTA involving individuals coming into contact with the third rail at grade crossings was for the limited purpose of showing notice to the CTA that the accidents occurred and that the evidence was not to be considered for any other purpose.

Further, in closing argument, defense counsel argued to the jury that the trial court would read a limiting instruction to it to consider the evidence of prior incidents on the issue of notice. Finally, the trial court instructed the jury that whatever evidence was received for a limited purpose should not be considered for any other purpose.

Our determination that the evidence of the prior incidents was not admitted to show that the third rail was unreasonably dangerous obviates the need for us to consider the CTA's substantial-similarity argument.

The CTA's second challenge to the jury verdict is that the trial court erred in denying the CTA's motions *in limine* to bar testimony of plaintiff's expert. The CTA maintains that plaintiff relied upon Heilman's testimony to establish that the Ravenswood crossing was unreasonably dangerous. According to the CTA, Heilman's testimony did not establish that the crossing was unreasonably dangerous because Heilman had no degree in engineering; had "no experience in the day-to-day operations of a major metropolitan transit system"; reached his opinions based upon information supplied to him by plaintiff's attorney; and was unable to testify how the CTA could implement his suggestion to install cover boards.

An expert witness is "a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation." (134 Ill. 2d R. 220(a)(1).) If an expert possesses specialized knowledge that will assist the trier of fact, he may testify concerning that knowledge. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §702, at 493 (5th ed. 1990).

The proponent of the testimony bears the burden of establishing the qualifications of a person to testify as an expert witness on a particular subject. (*People v. Park* (1978), 72 Ill. 2d 203, 209.) Formal academic training or specific degrees are not required to qualify a person as an expert; practical experience in a field may serve just as well to qualify him. (*Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 37.) Whether a witness is qualified to testify as an expert rests within the sound discretion of the trial court. *Schaffner*, 129 Ill. 2d at 36; *Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 250.

Charles Heilman, who was called as plaintiff's safety expert, testified that he is a safety engineer and safety consultant. He attended Northeastern University in Massachusetts where he studied pre-engineering for a period of two years. He is a member of the American Society of Safety Engineers, and is a certified safety professional by the Board of Certified Safety Professionals and a registered professional engineer in the State of California. In the past, he has provided consulting services to utility companies concerning transmission and distribution lines and the protection of their employees and the general public from the hazards of those lines.

Heilman further testified that he has performed safety analyses of conditions on several railroads, including rapid transit systems. He is familiar with customs,

practices and standards in rapid transit systems and third rails.

Heilman testified regarding the safety of the Ravenswood grade crossing third rail. In view of his knowledge, experience and skill in the area of safety and the transmission of electric power, we find no abuse of discretion in the trial court's decision to permit him to testify as an expert on the unsafe condition of the grade crossing third rail.

Further, the CTA's assertions, *viz.*, Heilman based his opinions upon information supplied by plaintiff's attorney, and Heilman was unable to testify how the CTA could implement the suggestion to install a cover board, do not defeat Heilman's competency to testify in the area of safety. Moreover, we know of no rule which dictates the source of information upon which an expert must base his opinion. It would seem to us that the more relevant inquiry is the reliability of the information upon which the expert relies.

Third, the CTA argues that plaintiff failed to establish that a catenary or gates were preferable to trespass barriers or that the installation of cover boards or additional warnings would have prevented plaintiff's decedent's death. The CTA maintains that the jury's finding that the CTA breached its duty of care by choosing to install trespass barriers instead of a catenary, gates or cover boards or that the lack of either or additional warnings caused plaintiff's decedent's death was unsupported by competent evidence and against the manifest weight of the evidence.

The elements necessary for proof in a negligence action are duty, breach, injury and causation. (*Merlo v. Public Service Co.* (1942), 381 Ill. 300, 312.) By its contention, the CTA seeks to increase the burden of proof requirements beyond those of an ordinary negligence case. A plaintiff, in order to prevail on a claim of negli-

gence, is not required to prove, in addition to the elements of ordinary negligence, what conduct would have prevented injury.

In further support of its claim of incompetent evidence, the CTA again refers to Heilman's testimony. As we have already determined that Heilman was competent to testify on the issue of safety, we decline further discussion on this issue. Further, our earlier discussion on the issues of duty, breach and proximate cause adequately disposes of the CTA's assertion that the verdict is against the manifest weight of the evidence. Additional discussion would only be superfluous.

In support of its claim of prejudicial error, the CTA urges three additional arguments. First, the CTA argues that the trial court erred in permitting plaintiff's use of prior incidents to establish notice after the CTA offered to stipulate. The CTA maintains that once it offered to stipulate, notice was no longer an issue in the case. Further, the CTA urges that the evidence of prior incidents was cumulative and tended to confuse the jury. Thus, the CTA argues that it was error for the trial court to permit evidence on the issue of notice.

As a preliminary matter, we note that the admission of evidence, even cumulative evidence, is largely a matter committed to the sound discretion of the trial court. (*Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.* (1991), 217 Ill. App. 3d 94, 108; *Simmons v. City of Chicago* (1983), 118 Ill. App. 3d 676, 685; *Long v. Bennett* (1977), 55 Ill. App. 3d 50, 53.) The court's determination on admissibility is based upon a balance of the probative value and the prejudicial effect of the proffered evidence. Absent a clear showing that the trial court has abused its discretion in admitting certain evidence, its determination will remain undisturbed. *Skelton v. Chicago Transit Authority* (1991), 214 Ill. App. 3d

554, 577; *Hopkinson v. Chicago Transit Authority* (1991), 211 Ill. App. 3d 825, 844.

A stipulation, or a judicial admission, is an agreement between the parties or their attorneys with respect to business before the court. (*American Pharmaseal v. T E C Systems* (1987), 162 Ill. App. 3d 351, 355; *Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 3d 971, 989; 34 Ill. L. & Prac. *Stipulations* §1, at 166 (1958).) It has the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of that fact. (See 34 Ill. L. & Prac. *Stipulations* §8, at 178-79 (1958); McCormick, Evidence §254, at 142 (4th ed. 1992).) There is, however, no absolute rule on the subject.

The fact that an opponent has offered to stipulate or is not disputing a proposition for which evidence is being offered must, of course, be a consideration in the trial court's evaluation of the probative value of the proffered evidence. However, the fact that the proposition is not being disputed is not determinative. The proponent of the evidence is entitled to have the court also consider the fair and legitimate weight that introduction of the evidence would have upon the trier of fact. (See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1, at 170 (5th ed. 1990).) After all, "a colorless admission by the opponent may sometimes have the effect of depriving the party of the legitimate moral force of his evidence ***." (Emphasis omitted.) (9 J. Wigmore, Evidence §2591, at 824 (Chadbourn rev. ed. 1981).) A wealth of criminal law decisions demonstrates that an offer to stipulate to certain facts does not foreclose the presentation of such evidence. See, *e.g., People v. Henderson* (1990), 142 Ill. 2d 258, 319; *People v. Hudson* (1970), 46 Ill. 2d 177, 196-97; *People v. Scheck* (1934), 356 Ill. 56, 60-62; see also *Veer v. Hagemann* (1929), 334 Ill. 23, 27 (stating it is competent for witnesses to testify

as to mental condition of testator, and fact that his sanity is conceded as to certain date does not bar testimony of witnesses on that matter).

Having determined that the CTA's offer to stipulate did not bar presentation of the evidence, we must yet determine whether its admission was an abuse of discretion. Plaintiff presented evidence of notice in the form of testimony from David Silverzweig, an attorney who represented a plaintiff in an earlier negligence suit involving the CTA (*Mullen v. Chicago Transit Authority* (1961), 33 Ill. App. 2d 103). Silverzweig's testimony was very limited. He testified that in 1948 he represented a plaintiff who sustained an injury when he came into contact with the third rail of a CTA track and that the CTA had notice of those facts.

Following Silverzweig's testimony, plaintiff read into evidence the CTA's answers to two sets of interrogatories from two earlier cases in which the CTA was a party. In the answers, the CTA acknowledged injuries to persons coming into contact with a third rail at grade level. The first set of interrogatories acknowledged six incidents which had occurred between August 1968 and May 1973. The second set of interrogatories acknowledged four additional incidents which had occurred between July 1974 and June 1975.

Additionally, plaintiff read to the jury an allegation from the complaint in this case which stated that prior to October 1977, the CTA knew, or in the exercise of reasonable care should have known, that numerous persons had suffered injuries as a result of coming into contact with the third rail; particularly knew of the incidents set forth in the answers to interrogatories from the prior cases; and that the CTA admitted knowledge of the incidents set out in the answers.

Finally, plaintiff presented testimony from Thomas Boyle, the head of the safety department for the CTA,

concerning the date and place and nature of each incident from 1968 to 1973. Boyle, additionally, affirmed that there had been three additional incidents in 1974.

In responding to the CTA's objection to Boyle's testimony, the trial court stated that plaintiff had a right to have the testimony concerning the incidents "go in" by the person at the CTA who was responsible for safety. The court stated that it allowed the testimony, even though cumulative, because Boyle was the head of safety.

We agree that the evidence was cumulative. The trial court, however, made a reasoned decision to admit the notice evidence in these various forms. Significantly, the evidence was presented in such a manner as to give no more than the date, place and nature of the injury. Thus, the jury could not have been confused. We note that all effective evidence is prejudicial in the sense that it damages the party against whom it is offered. However, we are not persuaded that the evidence of prior incidents was unfairly prejudicial to the CTA. Therefore, we conclude that the trial court did not abuse its discretion in allowing its admission.

Finally, we note that the CTA's reliance on *Bullard v. Barnes* (1984), 102 Ill. 2d 505, is misplaced. In *Bullard*, the plaintiff suffered fatal injuries as a result of being involved in an accident. The defendant admitted liability. Thus, the only issue for the jury was damages. That notwithstanding, the plaintiff presented detailed evidence concerning the cause of the plaintiff's injuries and the defendant's conduct following the accident. (See *Bullard v. Barnes* (1983), 112 Ill. App. 3d 384, 392-93.) The appellate court held that this evidence was prejudicial and inflammatory, and required that the judgment be reversed. (*Bullard*, 112 Ill. App. 3d at 393-94.) This court affirmed. *Bullard*, 102 Ill. 2d 505.

Here, unlike in *Bullard*, the CTA denies liability. Thus, notwithstanding the CTA's admission, plaintiff was entitled to prove every element of her claim, and the evidence, which was probative on the issue of notice, was properly admitted. We do not find that the prior-incidents evidence, which was lacking in specifics, was either inflammatory or unduly prejudicial.

The CTA's second argument on the issue of prejudice is that the trial court erred in denying the CTA's motion for a mistrial following plaintiff's three emotional outbursts. We disagree.

The CTA describes that during a third emotional outburst, plaintiff sobbed uncontrollably and the court declared a recess and excused the jury. Plaintiff admits to only one emotional outburst during trial, allegedly occurring when she was in the courtroom and the jurors were in the jury room behind closed doors.

We are unable to determine from the record the extent of plaintiff's dramatic conduct. However, the record does reveal that during the course of plaintiff's testimony, the court recessed and excused the jury on three separate occasions. After the third recess, the trial court, concerned about jury sympathy, stated that the witness "had difficulty in responding to a question." During the third recess, plaintiff's counsel stated that he had spoken with plaintiff concerning the need for her to maintain her composure. There were no further incidents.

As far back as the decision in *Chicago & Erie R.R. Co. v. Meech* (1896), 163 Ill. 305, 317-18, this court held that unless the "dramatic occurrence" is intentional or is the result of an improper motive, "[t]he fact that a plaintiff *** suddenly swoons or faints, or gives vent to hysterical exclamations, or breaks down with hysteria, does not call for the granting of a new trial."

Here, the trial court was keenly aware of the potential effect of plaintiff's conduct on the jury. After the third dramatic occurrence, the trial court noted that the jury's decision was to be made without sympathy or prejudice. In denying the CTA's motion for a mistrial, the trial court stated that it did not find plaintiff's conduct to have been so prejudicial as to require the granting of a new trial.

We do not believe, and the CTA makes no assertion, that plaintiff's conduct was either intentional or the result of any improper motivation. Significantly, during the recess which followed the third incident, plaintiff's counsel advised the court that he had admonished plaintiff concerning the importance of remaining composed and no subsequent incidents occurred.

The trial court was in the best position to assess the plaintiff's conduct and to determine its effect upon the jury. We, therefore, defer to its findings. It does not appear to us that the trial court was clearly wrong in finding no prejudice. Accordingly, we find no abuse of discretion in the denial of the CTA's motion for mistrial.

We note that *Stephans v. Chicago Transit Authority* (1960), 28 Ill. App. 2d 229, a case upon which the CTA relies, is factually distinguishable. In *Stephans*, the trial court's grant of a new trial was not the result solely of plaintiff's and his wife's outbursts, but rather resulted from a combination of errors, including unsatisfactory testimony on the plaintiff's injuries. *Cf. Meech*, 163 Ill. 305 (no new trial where "during examination of the witness Ella Louise Hoyt the plaintiff became hysterical, broke out crying and uttered a cry of distress, and was carried out of the court room; that immediately at the time of the occurrence his wife exclaimed, 'You're killing my husband,' and that the witness began to cry and was temporarily excused from the stand"); see also *Mondelli v. Checker Taxi Co.* (1990), 197 Ill. App. 3d 258 (fact

that plaintiffs wept twice during their counsel's opening statement and once at trial did not entitle defendants to new trial where weeping was brief, and after second occurrence, plaintiff's counsel offered to and did remove clients from courtroom during remainder of opening statement).

Third, the CTA argues that the trial court abused its discretion in permitting plaintiff to amend her complaint to change her theory of the case immediately before closing argument. The CTA urges that it was "genuinely surprised by the new theory" and was prejudiced by the amendment.

Here, prior to closing argument, plaintiff moved the court to amend her complaint. The trial court permitted the amendment over the CTA's objection. The amendment alleged that the CTA used and transmitted electricity without safeguards.

In Illinois, courts are encouraged to freely and liberally allow the amendment of pleadings. (See *Bank of Northern Illinois v. Nugent* (1991), 223 Ill. App. 3d 1, 13; *Senese v. Climatemp, Inc.* (1991), 222 Ill. App. 3d 302, 320.) Notwithstanding that liberal policy, a party's right to amend is not absolute and unlimited. (*Whildin v. Kovacs* (1980), 82 Ill. App. 3d 1015, 1017.) The decision whether to grant leave to amend a pleading rests within the sound discretion of the trial court. (*Old Salem Chautauqua Association v. Illinois District Council of the Assembly of God* (1958), 13 Ill. 2d 258, 266.) Absent an abuse of that discretion, its decision will not be disturbed on review. (See *McCastle v. Sheinkop* (1987), 121 Ill. 2d 188, 194.) Among the factors to be considered in determining whether or not to permit an amendment to the pleadings are whether the amendment would cure a defect in the pleadings; whether the other party would be prejudiced or surprised by the proposed amendment; timeliness of the proposed amendment; and whether

there were previous opportunities to amend the pleadings. *Loyola Academy v. S & S Roof Maintenance* (1992), 146 Ill. 2d 263, 273, citing *Kupianen v. Graham* (1982), 107 Ill. App. 3d 373, 377.

Prior to considering the factors which we have set out above, we note our disagreement with the CTA's assertion that the amendment changed the theory of the case. There is no allegation that plaintiff's amendment was for the purpose of curing a defect in the original pleading. Thus, this factor is not relevant to our analysis. Additionally, because amendments may be allowed at any time before the entry of a final judgment (Ill. Rev. Stat. 1991, ch. 110, par. 2—615(a)), the timeliness of plaintiff's amendment is not at issue.

Concerning the prejudice factor, we note the following. Throughout the course of trial, evidence was presented that the third rail carried 600 volts of electricity. Also, George Millonas, the director of plant maintenance for the CTA, testified in his evidence deposition that the CTA controlled the electrical force by dispersing it through the third rail and that the CTA could turn the electricity on or off. Ronald Swindell, director of power signals and communications for the CTA, testified that his job was to see that power is transmitted to the rapid transit system in a safe manner and to make certain that electrical current was capable of being delivered. Additionally, Thomas Wolgemuth, another CTA employee, testified that the CTA purchased its power from Commonwealth Edison and transformed it to 600 volts DC in its substations. Also, plaintiff presented evidence on the issue of the adequacy of warnings as well as the absence of certain types of barriers at the grade level crossing. The CTA, in rebuttal, presented evidence to prove the adequacy of the warning and barriers at the crossing.

Ordinarily, once a trial has begun, an amendment should not be permitted to set up matters of which the pleader had full knowledge at the time of interposing the original pleading and no excuse is presented for not putting its substance in the original pleading. (*Blazina v. Blazina* (1976), 42 Ill. App. 3d 159, 165.) This is particularly true where the amendment is prejudicial or would alter the nature and quality of the proof required to defend. (*Blazina*, 42 Ill. App. 3d at 165.) However, where prejudice is not likely to result, the trial court may permit amendment.

The CTA does not suggest, and we do not find, that plaintiff's amended complaint required the CTA to present evidence other than that which it had already presented in order to defend against the added allegation. Because plaintiff's amendment did not alter the nature and quality of the proof required for the CTA to defend, we fail to see how the CTA was thereby prejudiced. In fact, it appears that the amendment did no more than conform the pleadings to the evidence adduced at trial.

Finally, we believe that plaintiff had other opportunities, prior to the close of the CTA's case to amend the pleadings. Evidence concerning the distribution of electricity had been adduced by plaintiff in her case in chief. That notwithstanding, because the CTA was not prejudiced by the amendment, we are unable to conclude, based upon this factor alone, that the trial court abused its discretion in permitting the amendment.

In sum, we find that the jury verdict is properly and adequately supported by competent evidence. Accordingly, we find no error in the trial court's denial of the CTA's motion for directed verdict or for judgment notwithstanding the verdict.

### Damages Award

Finally, the CTA contends that the jury's apportionment of fault and award of damages were the product of prejudice and unsupported by the evidence. The CTA maintains that the combination of plaintiff's emotional outbursts, the use of the prior-incidents evidence, and plaintiff's "carefully crafted" reasonable anticipation stipulation led to the jury's 50-50 apportionment of liability and its $3 million verdict. The CTA argues that the verdict was excessive and compels a new trial, or, at the very least, remittitur.

As we have stated, the jury awarded damages in the amount of $3 million. The award to plaintiff was reduced by 50% for decedent's own negligence.

The amount of a damage award is peculiarly an issue of fact for the jury to determine. (*Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 452.) A jury's award in a wrongful death action should not be overturned unless it is obviously outside the limits of fair and reasonable compensation (see *Drews v. Gobel Freight Lines, Inc.* (1991), 144 Ill. 2d 84, 97) or unless it is obviously the result of passion or prejudice (*Phelps v. Chicago Transit Authority* (1991), 224 Ill. App. 3d 229, 234; *Shaheed v. Chicago Transit Authority* (1985), 137 Ill. App. 3d 352, 359). Further, a jury's award will not be subject to remittitur where it falls within the flexible range of conclusions which can reasonably be supported by the facts. (*Chambers v. Rush-Presbyterian-St. Luke's Medical Center* (1987), 155 Ill. App. 3d 458, 468; *Guerrero v. City of Chicago* (1983), 117 Ill. App. 3d 348, 352.) Where the jury is properly instructed and has a reasonable basis for its award, a reviewing court will not disturb its verdict.

The CTA makes no assertion that the jury was improperly instructed on the issue of damages, and our review reveals no impropriety. Further, we have deter-

mined that the admission of the prior-incidents evidence was proper and that plaintiff's dramatic conduct was not prejudicial. Thus, we reject the CTA's assertion that these factors resulted in an excessive verdict.

The jury heard evidence that the remaining life expectancy of a man decedent's age (46) was 27.9 years. Calib Peterson, decedent's employer, testified that at the time of death, decedent's gross salary was $144 weekly, plus fringe benefits, valued at $100 monthly. Peterson further testified that the age of retirement was 70 years and that decedent would receive an annual 10% increase in earnings each year. Further, Peterson testified that, at the time of trial, the fringe benefits were valued at $350 per month.

In closing argument, plaintiff argued that the amount of lost wages and benefits for a period from 1976 up until the time of trial (1987) amounted to about $407,000. Plaintiff represented to the court that this figure did not include an inflation factor, no 10% salary increases were computed beyond 1987, and the fringe benefit estimate was calculated on the lower figure of $100, as opposed to the higher $350 rate about which Peterson testified.

Accepting plaintiff's calculations on lost wages alone, we do not find that the jury award in this case was excessive. It is presumed that the wrongful death of a decedent results in substantial pecuniary loss to lineal heirs. (*Long v. Bennett* (1977), 55 Ill. App. 3d 50, 52.) In arriving at a fair and reasonable award, the jury could properly have considered the lost wages and benefits along with the loss of society and companionship to decedent's wife and two sons. Moreover, even if we were to consider a different verdict than the jury, we would not be free to reweigh the evidence. (*Allendorf v. Elgin, Joliet & Eastern Ry. Co.* (1956), 8 Ill. 2d 164, 171.) The CTA has failed to demonstrate any impropriety in the jury's award of damages.

Finally, we note that the CTA's reliance on *Panepinto v. Morrison Hotel, Inc.* (1966), 71 Ill. App. 2d 319, is unavailing. In *Panepinto*, the reviewing court was called upon to determine the propriety of the trial court's grant of a new trial. On appeal, the court stated that when "the verdict could well have been influenced by incompetent evidence erroneously admitted, or by erroneous instructions; or is clearly unwarranted by the competent damages evidence; or indicates passion or prejudice; reasonable discretion imposes a duty upon the trial judge to grant a new trial." (*Panepinto*, 71 Ill. App. 2d at 336.) The improprieties which occurred in *Panepinto* simply are not present in this case.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is reversed and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE BILANDIC took no part in the consideration or decision of this case.

JUSTICE MORAN, dissenting:

The issue is whether the CTA owed a duty of ordinary care to the decedent Lee, who was a trespasser on its right-of-way. The majority adopts section 337 of the Restatement to impose that duty on the CTA. Because the knowledge requirement of section 337 has not been satisfied under the facts of this case, I respectfully dissent from the majority's decision.

The rule in Illinois has long been that a landowner owes a trespasser only the duty to refrain from willfully or wantonly injuring him. (*Marcovitz v. Hergenrether* (1922), 302 Ill. 162, 167.) A limited number of exceptions

to the rule have been recognized over the years. Thus, if trespassers are discovered in a place of danger (*Briney v. Illinois Central R.R. Co.* (1948), 401 Ill. 181, 186) or if the landowner knows that trespassers have frequently intruded in a limited area (*Bernier v. Illinois Central R.R. Co.* (1921), 296 Ill. 464, 471), the landowner must exercise due care towards them. Similarly, if small children foreseeably intrude on the landowner's property and are unable to appreciate the risk involved, the landowner must take due care to protect them from being injured due to a dangerous condition on the premises. *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 625.

With today's decision, the majority has carved out yet another exception to the trespasser rule. In this case, the majority purports to follow section 337 of the Restatement, entitled "Artificial Conditions Highly Dangerous to Known Trespassers." Section 337 provides:

> "A possessor of land who maintains on the land an artificial condition which involves a risk of death or serious bodily harm to persons coming in contact with it, is subject to liability for bodily harm caused to trespassers by his failing to exercise reasonable care to warn them of the condition if
>
> (a) *the possessor knows or has reason to know of their presence in dangerous proximity to the condition,* and
>
> (b) the condition is of such a nature that he has reason to believe that the trespasser will not discover it or realize the risk involved." (Emphasis added.) Restatement (Second) of Torts §337, at 195 (1965).

The majority recognizes that, in order to establish a duty of ordinary care under section 337, the trespasser must first show that the landowner knew or had reason to know of the trespasser's presence. Comment *a* to section 337 states that the rule "relates only to the conditions under which a possessor of land is subject to liability to a trespasser whom he *knows to be about to come in contact* with a highly dangerous artificial condition

maintained by him upon the land." (Emphasis added.) (Restatement (Second) of Torts §337, Comment *a*, at 195 (1965).) Thus, section 337, as explained by comment *a*, requires foreseeability in fact. If section 337 were correctly applied to the facts of this case, the CTA would clearly not be liable. The majority, however, refuses to accept comment *a*'s limitation of section 337 to instances where the landowner knows that the trespasser is about to come into contact with a dangerous condition on his premises. In this, it relies upon the reasoning of the only jurisdiction which has previously adopted section 337 without accepting the interpretation of comment *a*. (See *Webster v. Culbertson* (1988), 158 Ariz. 159, 761 P.2d 1063.) In my opinion, the Arizona case is inapplicable to the facts of the case at bar.

In *Webster*, the defendant had erected a barbed wire fence to keep trespassers from entering her property. The fence crossed over a wash in which footprints, tire tracks and hoofprints were plainly visible. The wash was visible from defendant's house, and she visited the area approximately once a week. Evidence indicated that, at the time of the accident, the wash was used by pedestrians, children, motorcyclists, four-wheel drive vehicles, dunebuggies and equestrians for recreational purposes. Defendant's fence was virtually invisible, and she had posted no signs to alert trespassers to its existence. The plaintiff was injured when he rode his horse into the fence. Adopting section 337, the Arizona Supreme Court rejected defendant's argument that she had no knowledge or reason to know of the plaintiff's presence, and reversed the trial court's grant of summary judgment in her favor. The majority states that the Arizona court thus imposed a duty to warn on a person who maintains a dangerous artificial condition when the person is aware of the "possibility" that others will come into dangerous proximity of the condition. (152 Ill. 2d at 451.) However,

the *Webster* court instead stated that section 337 is applicable when the defendant has "reason to know" of the presence of trespassers. *Webster*, 158 Ariz. at 163, 761 P.2d at 1067.

Moreover, the facts of the present case are markedly different from those in *Webster*, where there was ample recent evidence of the presence of many trespassers. Here, the CTA stipulated that it had notice of 10 prior accidents in the 3.2-mile right-of-way where its third rail runs at grade level. Thus, it could reasonably *anticipate* the intrusion of trespassers. However, the CTA had no actual *knowledge or reason to know* that trespassers had recently been within its right-of-way at the Kedzie/Ravenswood crossing. Not only had there been no accidents along the entire 3.2-mile stretch of street-level third rail within the previous 15 months, but, more to the point, there was no physical evidence that intruders had recently entered the particular area where the accident occurred in 1977. Although a youth had fallen onto the third rail from a fence he was scaling at that location in 1974, there was no recorded incident of a pedestrian ever previously contacting the third rail after leaving the sidewalk at the Kedzie/Ravenswood crossing. I do not believe that the CTA's knowledge of accidents taking place more than 15 months earlier and at other locations along the line is enough to satisfy comment *a*'s requirement that a landowner have reason to know that a trespasser is *about to come into contact* with the third rail. Further, even if comment *a* were not to apply, the facts of this case fail to satisfy section 337's requirement that the CTA knew or had reason to know of the presence of trespassers at the Kedzie/Ravenswood crossing.

In a conclusory manner, the majority points to policy reasons—the likelihood of injury, the magnitude of guarding against the injury, and the consequences of placing that burden on the defendant—for its imposition of a

duty of ordinary care on the CTA. However, the majority does not weigh the cost to the CTA—and the public—of putting into place and maintaining other safeguards. The CTA contends that measures such as swinging gates and catenary wires would impose a heavy financial burden, and that such measures have not proved effective in protecting the public. Consequently, the CTA placed signs warning "Danger," "Keep Out" and "Electric Current" within several feet of the third rail at the Kedzie/Ravenswood crossing. It also installed pointed boards on the ground to alert trespassers to the fact that they were walking where they ought not to be. That the CTA might have taken more extensive precautions to warn the public of danger goes to the question of whether it breached its duty of ordinary care, not to whether it had such a duty in the first place. See, *e.g., Deibert v. Bauer Brothers Construction Co.* (1990), 141 Ill. 2d 430, 441.

Because the presence of trespassers at the Kedzie-Ravenswood crossing was not foreseeable in fact, I do not believe that the CTA had a duty of ordinary care towards trespassers at that location. The jury found that the CTA's conduct was not willful and wanton. Consequently, in my view the CTA was not liable for the injury to Lee. I believe that the majority's decision to the contrary will go far towards making the CTA and any other landowner who can possibly anticipate the presence of trespassers in a dangerous area an absolute insurer of public safety.

JUSTICE HEIPLE, also dissenting:

This case demonstrates once again the casino-like atmosphere of our tort system. A drunken 46-year-old Korean immigrant whose blood alcohol was 0.341, or three times the legal limit for intoxication under the motor vehicle code, walked off the sidewalk and up the Chicago Transit Authority railroad tracks where he was electro-

cuted by the so-called third rail which supplies power to the electric trains. At his point of entry, the decedent walked past three warning signs, "DANGER," "KEEP OUT" and "ELECTRIC CURRENT." These signs were printed in English which the decedent could not read. With a 0.341 concentration of blood alcohol, however, it is questionable whether it would have mattered if the signs had been printed in Korean or even in pictures. The decedent was virtually blind drunk.

In addition to the signing, sharp triangular shaped boards had been installed between the sidewalk and the third rail to make it extremely difficult and awkward for a person to walk up the tracks. Nonetheless, the decedent walked up the tracks approximately 6½ feet to the point where the third rail began. There, attempting to urinate, he was electrocuted.

At the time of his death, his yearly gross income including all fringe benefits was approximately $8,700. He had a remaining life expectancy of approximately 28 years. He left surviving a widow and two sons. The jury returned a verdict of $3 million reduced by 50% for the decedent's own negligence. The net verdict was thus $1.5 million.

As with any tort case, there are two primary elements, namely, liability and damages. As to liability, at the time of this accident, Illinois was operating under the pure form of comparative negligence. That is to say, if a defendant were at fault to any extent, the plaintiff could recover that percent of his damages. In other words, a plaintiff who was 90% negligent on his own behalf could still recover 10% of his damages from a partially culpable defendant. Due to a statutory enactment, however, since November 25, 1986, an injured plaintiff may now recover damages only so long as the percentage of his fault does not exceed 50% of the total. Ill. Rev. Stat. 1991, ch. 110, par. 2—1116.

Considering the operative facts, it is clear to this writer that the jury finding of 50% fault on the part of the Chicago Transit Authority is grossly erroneous and warrants reversal on that element alone. It is fair to say that some negligence may be attributable to the CTA since various safety devices could or might have been installed that would have made entry to the track area more difficult. A 10% degree of negligence or thereabouts would be in the range of reasonableness. A finding of a 50% degree of negligence is, as I have indicated, grossly erroneous. Such a finding could only be the result of sympathy, passion, prejudice or ignorance.

Regarding the second element, namely, damages, the jury verdict once again overshot the mark. It fixed the plaintiff's damages at $3 million reduced by 50% for its finding of decedent's own negligence. The net verdict was thus $1.5 million. The oft-quoted aphorism that figures don't lie but liars can figure is certainly true. The decedent's estate and survivors were not damaged to the extent of $3 million. It is quite a simple proposition to puff up a damage verdict to offset its reduction by the comparative negligence percentage. Thus, as in this case, a jury wanting to give a decedent $1.5 million but choosing to find him 50% at fault could very simply just double the damage figure. Whether the jury's calculations in the instant case were the result of intellectual dishonesty and, hence, corrupt or whether they were simply the result of honest mistakes or poor judgment is a matter of conjecture only and not the controlling issue. That the jury was wrong, however, seems clear.

As to the loss to decedent's estate, simple multiplication of 28 years of life expectancy times his annual earnings would equal approximately $250,000. If one were to add another $250,000 for loss of society to his family and another $250,000 for the one-third to be paid to the attorney, the total verdict would be in the range of

$750,000. Reducing this figure under pure comparative negligence by a 90% fault figure attributable to decedent, a net verdict of $75,000 is produced.

It seems apparent in this case that the bulk of the jury verdict could only be allocated to that concept we call "loss of society." This is so since it could not possibly be justified on a loss of income basis.

What is loss of society worth? In Illinois, we have chosen to give the jury carte blanche authority to fix this figure. The law falsely pretends that the concept "loss of society" has a quantifiable cash value when it clearly does not. Certainly, no one can deny the reality of the feeling of deprivation upon the loss of a loved one. Loss of society is a real loss which causes real suffering. But such a loss cannot be quantified with a dollar sign. As was observed in 1986 by the West Virginia Supreme Court, "if the measure of damages were the value of a human life then, arguably, no jury verdict could be excessive. The death of a family member *** involves inconsolable grief for which no amount of money can compensate. Counsel's suggestion that the [family] would not have traded [their child's] life for $10,000,000 is entirely accurate—but they would also not have traded [their child's] life for $100,000,000 or even $1,000,000,000." *Roberts v. Stevens Clinic Hospital, Inc.* (W. Va. 1986), 345 S.E.2d 791, 800.

By refusing to recognize any limits on such damage awards, litigants, with the assistance of their attorneys, are turning the court system into a giant gambling casino. Pain, suffering, or the loss of a loved one may produce incalculable wealth if only the person causing the injury is wealthy enough or carries enough insurance.

What we are witnessing here is a vast predatory movement of citizen against citizen, the magnitude of which is beyond calculation. All of this predation is taking place under the form of legal, political and govern-

mental procedures. Though selected individuals are being made rich, most notably the plaintiffs' personal injury lawyers, society as a whole is crippling itself.

No corporation is large enough, no individual is rich enough, no amount of insurance coverage is high enough to prevent a defendant's financial destruction in a negligence law suit under existing standards. It is long past time for the courts to recognize that damages such as pain and suffering and loss of society do not have a quantifiable dollar value. If society is to allow compensation for such injuries, then society has a duty to limit recovery to some rule of reasonableness.

While the courts could order remittitur in an appropriate case such as the case we decide today, they have shown no willingness to do so. The only recourse for the public is through action on the part of the legislature with the setting of statutory limits. Action is needed now and is long overdue.

For the reasons given, I respectfully dissent.