BERNARD DALE FERRELL, Plaintiff-Appellee, v. J.W. ESPARZA, d/b/a Joe's Steam-It, Defendant-Appellant.

Fifth District No. 5—00—0234

Opinion filed December 7, 2001.

Stephen R. Green, of Armstrong & Green, of Marion, and Jay S. Judge and Michael J. Cronin, both of Judge & James, Ltd., of Park Ridge, for appellant.

John Womick, of Womick Law Firm, Chtrd., of Carbondale, for appellee.

PRESIDING JUSTICE MAAG delivered the opinion of the court:

Bernard Dale Ferrell (plaintiff) filed a negligence action against J.W. Esparza, doing business as Joe's Steam-It (Joe's), to recover damages for injuries he suffered as a result of his exposure to excessive levels of carbon monoxide. The circuit court of Saline County entered a summary judgment in favor of plaintiff on the issue of liability. The jury awarded $355,000 in damages to plaintiff. Joe's appeals. On appeal Joe's contends that the summary judgment was improper because Joe's owed no duty to plaintiff and its conduct was not a proximate cause of plaintiff's injuries.

The basic facts are not disputed. On December 27, 1991, plaintiff was employed by Roundy's, Inc. (Roundy's), and was assigned to work an afternoon shift in its Saline County warehouse. Food products were stored in this warehouse. When plaintiff reported to the warehouse at approximately 3 p.m., he was directed to begin moving frozen-food products out of a dairy cooler located inside the warehouse. The cooler was a room about 10 feet from floor to ceiling and about 12 feet wide. There were two entrances to the cooler. Plastic curtain strips covered the entrances. The frozen inventory was to be removed so that the dairy cooler could be cleaned. Roundy's had been given 24 hours to clean the cooler, after an inspection revealed an unsanitary condition inside.

Roundy's hired Joe's to steam-clean and to sanitize the cooler. The job was scheduled to be completed in 12 hours. Joe's employees, Ed Esparza and Doug Ewell, reported to the warehouse at about 3 p.m. on December 27, 1991. When they arrived, Esparza and Ewell saw Roundy's employees using forklift trucks to remove products from the cooler. Roundy's employees continued to remove the inventory while Esparza and Ewell set up their steam-cleaning equipment. Esparza and Ewell placed the steam-cleaning machine inside the warehouse but outside the cooler. The machine was stationed approximately 50 feet from the front door of the cooler. It was near a railroad dock door that had been partially opened so that there would be some air flow to prevent the machine from overheating. Roundy's would not permit the railroad dock door to be opened completely because of its concern that outsiders would enter the building. Joe's steam-cleaning machine was powered by gasoline. Its heater ran on kerosene.

Both Esparza and Ewell were aware that the steam-cleaning machines produced carbon monoxide. Both were aware that exposure to carbon monoxide was hazardous and potentially fatal. Both knew the signs and symptoms of carbon monoxide poisoning. Joe's told its employees that the steam-cleaning machines were not to be brought inside a building. Joe's instructed its employees to keep the steam-cleaning machines outside to allow for ventilation and to prevent overheating. Joe's did not provide its employees with a carbon monoxide detector to use during the steam-cleaning process. Ewell testified that he had steam-cleaned inside other buildings but that the steam-cleaning machine was kept outside and long hoses were employed. He remembered working only one job where the machine was actually brought inside. That was a 20- or 30-minute job.

Because of the unplanned delay in removing inventory from the cooler, Joe's employees did not start cleaning until about 5 p.m. Esparza and Ewell began cleaning the front walls of the cooler while Roundy's employees continued to remove products through the rear door. Three or four forklift trucks were moving in and out of the cooler as Esparza and Ewell began to work. Soon after they started cleaning, Esparza and Ewell noticed clouds of steam condensation building, making it difficult to see inside the cooler. A fan was placed in the front entrance to the cooler. It drew the steamy air from the cooler and blew it into the warehouse. There were two ventilation windows inside the cooler, but they were not open. There was no cross-ventilation.

Because of the deadline it faced, Roundy's called in a second cleaning company. The second company arrived sometime between 7 p.m. and 8 p.m. and began steam-cleaning the rear part of the cooler. The

second company used a large, gasoline-powered steam-cleaning machine and two smaller electric machines. The larger machine was set up on a trailer bed on a dock inside the warehouse, near the rear door of the cooler. The two smaller machines were set up inside the cooler. All of the machines had either kerosene- or diesel-powered heaters.

Throughout the cleaning process, plaintiff and other Roundy's employees were working inside the cooler. They were using fuel-powered water vacuums and squeegees to rid the cooler floor of water produced during the steam-cleaning process. They also continued to move inventory around inside the cooler.

About six hours into the cleaning process, Esparza and Ewell noticed a haze in the cooler. During a break, they learned that some of Roundy's employees were complaining of headaches and nausea. Esparza also had a headache and felt nauseous. Esparza thought that carbon monoxide emissions from the cleaning equipment caused the haze inside the cooler room, and he mentioned that to a Roundy's manager. He and Ewell then returned to the cooler to finish cleaning it. They worked for another hour before leaving the building.

While working inside the cooler, plaintiff became dizzy. He felt sick to his stomach and his chest was tight. As he walked out of the cooler and into the warehouse, he collapsed. A coworker noted plaintiff's condition and called for assistance. Plaintiff and another coworker who had similar symptoms were transported to Ferrell Hospital.

Dr. Partridge, an emergency medicine specialist, was called to treat plaintiff and the other Roundy's employee. Dr. Partridge testified that both men presented with the same history. Both men had been working inside the cooler for an extended period of time. After working several hours, each began to complain of a headache, nausea, weakness, and blurred vision. Dr. Partridge ordered blood tests. Plaintiff's blood test revealed a carbon monoxide level of 26.7. Dr. Partridge testified that his initial diagnosis was mild-to-moderate carbon monoxide poisoning. He opined that the carbon monoxide level in plaintiff's blood probably peaked at 31. The normal level of carbon monoxide in the blood is 2.7.

Plaintiff was admitted to the hospital and treated with pure oxygen. He was discharged the following morning, after blood tests revealed that his carbon monoxide level had returned to the normal range and that his vital signs were found to be within normal limits. Following his discharge, plaintiff suffered from symptoms of weakness, breathing difficulties, dizziness and balancing problems, anxiety and jitters, angry outbursts, and confusion.

Dr. Michael Evans, a toxicologist retained by plaintiff, testified

that plaintiff's condition was caused by an exposure to an excessive level of carbon monoxide. He explained that carbon monoxide binds to hemoglobin, depriving the blood of oxygen. The process also renders the blood unable to transport carbon dioxide from the tissues back to the lungs, resulting in a buildup of carbon dioxide in the tissues.

Joe's expert, Dr. Alan Weston, an environmental engineer, opined that the carbon monoxide produced by Joe's machine alone would not have been sufficient to cause carbon monoxide poisoning. He was not critical of Joe's employees for setting up the steam-cleaning machine inside the warehouse, indicating that because the warehouse was so large, it was almost like being outside. He concluded that emissions produced by Joe's machine would have been diffused and disbursed throughout the warehouse, resulting in reduced concentrations throughout the building. Dr. Weston conceded that the carbon monoxide levels produced by Joe's steam-cleaning machine would have contributed to the carbon monoxide level inside the cooler. He testified that the carbon monoxide produced by the machines sitting in the warehouse would have been distributed in equal concentrations throughout the cooler and the warehouse. Dr. Weston opined that there should have been some device to measure carbon monoxide emissions inside the cooler because the machines inside the cooler were combusting fuel. Dr. Weston testified that he could not state the emissions concentrations of each machine used inside the warehouse because he did not have sufficient information about the engine specifications of each machine.

Joe's contends that the trial court erred in granting a summary judgment in favor of plaintiff. Joe's argues that it owed no duty to plaintiff and that its conduct was not a proximate cause of plaintiff's injury. In considering a motion for summary judgment, the trial court's task is to determine whether a disputed question of fact exists. *Block v. Lohan Associates, Inc.*, 269 Ill. App. 3d 745, 759, 645 N.E.2d 207, 217 (1993). A summary judgment is properly granted if the pleadings, depositions, admissions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2—1005 (West 1994). The review of a summary judgment is *de novo. Block*, 269 Ill. App. 3d at 759, 645 N.E.2d at 217.

A duty of care arises when the parties stand in such a relationship to one another that the law imposes upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525, 513 N.E.2d 387, 396 (1987). Stated differently, "[E]very person owes to all others a duty to exercise ordinary care to guard against injury which

naturally flows as a reasonably probable and foreseeable consequence of his act, and[ ] such duty does not depend upon contract \*\*\* but extends to remote and unknown persons." *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 86, 199 N.E.2d 769, 779 (1964). Factors relevant in determining whether a duty exists and the scope of that duty include the foreseeability of injury, the likelihood of injury, the magnitude of the risk of injury, the burden of guarding against the injury, and the consequences of placing that burden on the defendant. *Unger v. Eichleay Corp.*, 244 Ill. App. 3d 445, 449, 614 N.E.2d 1241, 1244 (1993). The question of whether a duty exists and the scope or range of protection of such a duty are normally questions of law to be determined by the court on a case-by-case basis. *Kirk*, 117 Ill. 2d at 525, 513 N.E.2d at 396; *Taake v. WHGK, Inc.*, 228 Ill. App. 3d 692, 712, 592 N.E.2d 1159, 1173 (1992).

In this case, Joe's was hired to steam-clean the dairy cooler inside the warehouse. In performing that work, Joe's employees were legally required to exercise the degree of care that a reasonably prudent steam-cleaning company would exercise under the same or similar circumstances. It is undisputed that Joe's knew that its cleaning equipment produced carbon monoxide emissions. Joe's instructed its employees that the cleaning machines were not to be set up inside. Joe's directed its employees that these machines were only to be operated outside, where the emissions could be quickly dissipated. Both Esparza and Ewell knew of the serious health hazards associated with exposure to excessive levels of carbon monoxide and the symptoms of carbon monoxide poisoning. It was clearly foreseeable that any worker who was exposed to an excessive concentration of carbon monoxide in the cooler could suffer serious, if not fatal, injuries. See *Hammer v. Slive*, 27 Ill. App. 2d 196, 201, 169 N.E.2d 400, 402 (1960) (noting that the lethal effect of excessive carbon monoxide is a matter of common knowledge).

■ The undisputed facts in this record show that there was a reasonable likelihood that workers who spent an extended period of time inside the cooler would be exposed to dangerously high levels of carbon monoxide, that the probability that those exposed to the hazard would suffer serious or fatal injuries was considerable, and that, on balance, the burden of guarding against the hazard was modest. After considering the relevant factors, we conclude that Joe's owed a duty of care to plaintiff. Joe's had a duty to perform its steam-cleaning operation in a manner that would not create a carbon monoxide hazard to those in the work area. Joe's employees violated their employer's instructions by bringing the machine indoors. The employees having done so, Joe's had a duty to ensure that there was adequate ventila-

tion in the work area during its cleaning operations, to assess the carbon monoxide levels in the work area, and to warn those in the work area once it was discovered that the carbon monoxide levels in the work area were hazardous.

The record demonstrates that Joe's breached its duty to the plaintiff and other workers in the cooler. It is undisputed that Joe's employees operated the cleaning equipment inside the warehouse despite instructions from their employer that the steam machines were not to be brought inside. Joe's employees operated this equipment indoors without any carbon monoxide detection devices. Joe's employees continued to operate the equipment even though they expressed concern about the lack of adequate ventilation within the warehouse and cooler. Joe's employees took no steps to assess the adequacy of the ventilation (a single fan drawing air out of the cooler) after additional carbon-monoxide-producing machinery was brought into the cooler. Joe's employees made no attempt to monitor the level of carbon monoxide in the work area, nor did they make an attempt to have it monitored. Nor did they warn those working inside after they recognized that the haze forming inside the cooler was likely carbon monoxide. Instead, Joe's employees returned to the cooler and continued to operate the steam-cleaning equipment even though they were experiencing symptoms of carbon monoxide poisoning. Given the undisputed facts, Joe's failure to act on a number of occasions constituted breaches of its duty of care to those who were working inside the cooler that evening.

Joe's is not relieved of its duty merely because the second cleaning company had and breached the same duty or because the second company's machines contributed to the carbon monoxide levels inside the cooler. Though neither cleaning company had any control over the equipment and employees of the other or over Roundy's employees, each had a common duty to use reasonable care in performing its cleaning operations. See *Economy Light & Power Co. v. Hiller*, 203 Ill. 518, 520-21, 68 N.E. 72, 73 (1903).

Finding that Joe's breached its duty to plaintiff does not resolve the liability issue, as there must be a proximate causal connection between Joe's breach of duty and the damages that plaintiff suffered. See *Stojkovich v. Monadnock Building*, 281 Ill. App. 3d 733, 738, 666 N.E.2d 704, 708 (1996). Joe's contends that its operation of the steam-cleaning equipment inside the warehouse was not a proximate cause of plaintiff's injury.

■ A proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause. *Unger*, 244 Ill. App. 3d at 451, 614 N.E.2d at 1246.

According to fundamental principles of tort law, there may be more than one proximate cause of an injury, and a defendant may be held liable for its conduct whether it contributed in whole or in part to the plaintiff's injury, so long as that conduct was a proximate cause of the injury. *Nelson*, 31 Ill. 2d at 88, 199 N.E.2d at 780. A tortfeasor cannot avoid responsibility merely because another person is guilty of negligence contributing to the same injury, even though the injury would not have occurred but for the negligence of the other person. See *St. Paul Insurance Co. of Illinois v. Estate of Venute*, 275 Ill. App. 3d 432, 438, 656 N.E.2d 113, 118 (1995). Though proximate cause is ordinarily a question for the trier of fact, it becomes a question of law when the material facts are undisputed and there can be no difference in the judgment of reasonable persons as to the inferences to be drawn from them. *Block*, 269 Ill. App. 3d at 756, 645 N.E.2d at 215.

■ Proximate cause is composed of two distinct concepts: cause in fact and legal cause. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455, 605 N.E.2d 493, 502 (1992); *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 354, 603 N.E.2d 449, 455 (1992). Legal cause is essentially a question of foreseeability. *Lee*, 152 Ill. 2d at 456, 605 N.E.2d at 503. Earlier in this decision we concluded that it was foreseeable that workers could suffer serious injuries from carbon monoxide poisoning if they were working in an inadequately ventilated area where machines were producing carbon monoxide emissions.

Cause in fact is established when there is a reasonable certainty that a defendant's conduct caused the injury or damage claimed. *Lee*, 152 Ill. 2d at 455, 605 N.E.2d at 502. The defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about. *Thacker*, 151 Ill. 2d at 354-55, 603 N.E.2d at 455.

In its brief and argument before this court, Joe's argued that there was "not one piece of evidence" that carbon monoxide from its machine ever reached the cooler. However, that argument ignores the fact that Joe's own expert conceded that carbon monoxide emissions produced by Joe's machine circulated throughout the warehouse, including the cooler.

Joe's also argued that the equipment of Roundy's and the other steam-cleaning company was the cause of the carbon monoxide in the cooler and that even if "trace amounts" of the carbon monoxide emitted from its machine had been introduced into the cooler and had "some effect" on plaintiff, such a "*de minimis* quantity" was not a substantial factor in creating excessive carbon monoxide in the cooler because the emissions from the other machines would have produced excessive levels of carbon monoxide in the cooler regardless of the amount produced by its machine.

■ Contrary to Joe's argument, the substantial-factor test is not concerned with the quantity of the injury-producing agent or force but, rather, is concerned with its legal significance. See *Wehmeier v. UNR Industries, Inc.*, 213 Ill. App. 3d 6, 31, 572 N.E.2d 320, 337 (1991). Further, though a defendant has the right to rebut evidence tending to show that his acts are negligent and a proximate cause of the plaintiff's injury and the right to establish by competent evidence that the conduct of a third person is the sole proximate cause of the plaintiff's injury (*Leonardi v. Loyola University*, 168 Ill. 2d 83, 101, 658 N.E.2d 450, 459 (1995)), Joe's evidence falls short. Joe's did not produce competent evidence to negate causation and to establish sole proximate cause in another's conduct. Moreover, Joe's breach of duty extended beyond emitting carbon monoxide into the work area. Joe's failure to ensure that there was adequate ventilation in the work area and failure to monitor the carbon monoxide levels in an inadequately ventilated work area contributed to plaintiff's injury.

The undisputed evidence shows that several machines were emitting carbon monoxide gas and that some of the carbon monoxide produced by Joe's machine was circulated into the cooler due to dissipation and a lack of cross-ventilation. Carbon monoxide emissions from Joe's machine inextricably mixed with and became part of the cloudy haze that hung inside the cooler. The undisputed evidence shows that plaintiff was exposed to carbon monoxide over a period of several hours while he was working in the cooler and that blood tests taken shortly after plaintiff collapsed revealed that he had a very high level of carbon monoxide in his blood. Those emissions caused a single, indivisible injury to plaintiff.

Joe's cannot escape liability for its negligence merely because the second cleaning company may also be liable. Where there is more than one proximate cause of an injury, one guilty of negligence cannot avoid responsibility merely because another person is also guilty of negligence contributing to the same injury, even if the injury would not have occurred but for the negligence of the other person (*Sears v. Kois Brothers Equipment, Inc.*, 110 Ill. App. 3d 884, 889, 443 N.E.2d 214, 219 (1982)) and even though the defendant's acts or omission did not create the source of damage (*Rendleman v. ABA Building Maintenance, Inc.*, 222 Ill. App. 3d 367, 371, 583 N.E.2d 703, 706 (1991)). The first party is held liable because its tortious conduct was an actual and proximate cause of the plaintiff's injury, and the fact that another individual or entity also contributed to the plaintiff's injury does not alter the concurring tortfeasor's responsibility for the entire indivisible injury. See *Woods v. Cole*, 181 Ill. 2d 512, 519, 693 N.E.2d 333, 336-37 (1998).

In this case, the undisputed evidence demonstrates that there was a concurrent neglect of a common duty by Joe's and others and that Joe's conduct was a proximate cause of an indivisible injury to plaintiff. Based upon this record, the summary judgment was properly granted in favor of plaintiff on the issue of liability. Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

WELCH and GOLDENHERSH, JJ., concur.