NOTICE
Decision filed 10/01/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 240100-U

NO. 5-24-0100

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

| | | |
|---|---|---|
| CHRISTOPHER COHOON and MICHELE COHOON, as Guardians of Disabled Adult Emily Cohoon, | ) ) ) ) | Appeal from the Circuit Court of Champaign County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 21-L-105 |
| HUNTER CROWE; CONDIT TOWNSHIP, a Civil Township; and RONALD SCUDDER, as Highway Commissioner of Condit Township, | ) ) ) ) ) | |
| Defendants | ) ) | |
| (Condit Township, a Civil Township, and Ronald Scudder, as Highway Commissioner of Condit Township, Defendants-Appellees). | ) ) ) ) | Honorable Benjamin W. Dyer, Judge, presiding. |

---

JUSTICE MOORE delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*:    The circuit court erred in granting summary judgment in a negligence action where a genuine issue of material fact exists.

¶ 2     The plaintiffs, Christopher Cohoon and Michele Cohoon, as guardians of disabled adult Emily Cohoon, filed suit for injuries sustained when Emily Cohoon, a passenger, was involved in a single-vehicle automobile accident. The circuit court granted summary judgment in favor of defendants Condit Township and Ronald Scudder on counts II and III of the plaintiffs' third

1

amended complaint on the issue of proximate cause, and the plaintiffs' appeal.[1] We find that a genuine issue of material fact exists which precludes entry of summary judgment. Therefore, we reverse and remand this matter for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4        On July 6, 2020, defendant Hunter Crowe, then 16, was driving Emily Cohoon, also 16, in her 2001 Chevrolet Monte Carlo in a northerly direction on County Road 600 East (600 East) in Condit Township, Champaign County, Illinois. The portion of 600 East on which the vehicle was traveling was north of County Road 2725 North and south of County Road 2800 North. That portion of 600 East is a chip-and-seal road fit for two lanes of travel without a center line.

¶ 5        As defendant Crowe drove north on 600 East, he lost control of the vehicle. After the Monte Carlo had passed an oncoming vehicle, it left the roadway off to the east at a high rate of speed, traveled across a section of grass, and struck a roadside tree. Crowe and Emily were both extracted from the wreck and airlifted to trauma centers. Although both teens survived, Emily is now a disabled adult. Neither Crowe nor Emily has any recollection of the details of the accident.

¶ 6        600 East has a statutory speed limit of 55 miles per hour. The actual speed of the vehicle is unknown; however, crash experts have estimated that the vehicle was traveling somewhere between 66 and 84 miles per hour at the point where the vehicle first left tire marks on the roadway. Lucy and Roger Woodcock, occupants of a separate vehicle traveling in the opposite direction on the same road, observed a portion of the crash. They observed the vehicle "bouncing" vertically on the roadway in an area known to them to be very bumpy. They gave statements to law

_____

[1]Count I of the plaintiffs' third amended complaint involves allegations of negligence against defendant Crowe. The circuit court's December 12, 2023, order only involves a determination of summary judgment as to counts II and III involving defendants Condit Township and Ronald Scudder. Thus, defendant Crowe is not a party to this appeal and any references to the allegations involving Crowe will be limited to the extent necessary.

enforcement that the "washboard" condition in the roadway caused the vehicle to bounce and lose control.

¶ 7     On June 18, 2021, the plaintiffs filed a one-count complaint alleging negligence against Crowe. On June 23, 2022, the plaintiffs filed an amended two-count complaint alleging an additional count of negligence against Condit Township. On August 18, 2023, the plaintiffs filed another amended complaint, entitled "Third Amended Complaint," containing all three counts of negligence alleged against the defendants herein. Count II of plaintiffs' third amended complaint alleged, *inter alia*, that Condit Township breached its statutory duty to exercise ordinary care to maintain County Road 600 East in a reasonably safe condition by (1) allowing road defects, including washboarding and potholes to exists, which could cause individuals to lose control of their vehicles; (2) utilizing improper maintenance activities which failed to address the washboarding defects and potholes; and (3) failing to inspect the roadway. Count III of plaintiffs' third amended complaint alleged the same acts and/or omissions of negligence against Ronald Scudder, as highway commissioner. Plaintiffs additionally alleged that as a result, Emily Cohoon suffered serious and permanent injuries and sought damages in excess of $50,000.

¶ 8     On August 31, 2023, defendants Condit Township and Ronald Scudder (Township defendants) filed an answer denying the material allegations and raising affirmative defenses under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2020)). The parties agreed to bifurcate the issues of liability and damages so the Township defendants could present their motion for summary judgment prior to the parties engaging in costly damages discovery, and the circuit court entered scheduling orders consistent with the same.

¶ 9    Several depositions and statements were taken in the case. Relevant to this appeal are the statements and depositions of Lucy and Roger Woodcock, the investigating officers, defendant Scudder, and the plaintiffs' expert witnesses.[2]

¶ 10    Lucy Woodcock (Lucy), an eyewitness, provided the following initial statement, captured by an officer's body camera, while at the scene of the crash:

"OFFICER: What did you observe, just, what did you observe?

LUCY: We were comin' up over the hill, and the car, it was coming northbound, and it was jumping up and down probably because of the bumps. And it started fishtailing, and I had to get over into the ditch for it to miss me. And I looked in my driver's mirror and I seen it lose control and roll several times.

OFFICER: Did you—was it going pretty fast?

LUCY: For this road, for that area, because of all the bumps, even 45 and 50 is too fast because if you don't have good tires but it—"

¶ 11    Later, Lucy provided a voluntary written statement to officers investigating the crash. In her statement, she stated that on July 6, 2020, she was driving south on 600 East with Roger Woodcock as a passenger. She observed the Monte Carlo crest the hill in front of them and saw the vehicle's back wheels "bouncing" up and down vertically and the driver turning his wheel left and right in an attempt to gain control. She was not surprised to see the vehicle bouncing like it was because she knew, having driven north on 600 East many times, the area of the road where the Monte Carlo was traveling was "very bumpy" and had a "washboard" effect. They pulled off to the side of the road believing that the vehicle was out of control and that the driver would not

---

[2]Hunter Crowe and Emily Cohoon's depositions are only relevant in as much to establish that neither individual has any independent recollection of the events immediately before, during, or after the incident.

be able to recover. As the vehicle approached, she observed the male driver attempting to regain control of the vehicle. Lucy observed the front passenger side tire go off the roadway onto the shoulder of the road and the driver attempt to correct the vehicle by turning back toward their direction. As the vehicle passed them, Lucy observed the vehicle begin to flip side-over-side in her mirror and strike a tree.

¶ 12    Lucy reported to officers that when she first observed the vehicle crest the hill it was "bouncing" probably due to the "washboard" or bumpy defect in the road. She reported that she had driven that section of the road many times and found that the bumps made it hard to control her vehicle at speeds of 45 miles per hour. She could not give an estimate of the vehicle's speed. She believed the washboard defect in the road caused the car to bounce and lose control.

¶ 13    During her deposition, when questioned by defense counsel about what caused the vehicle to bounce, the following colloquy occurred:

"Q. So, we talked a lot about your statements and your recollection. And I think you indicated that when you first noticed that Monte Carlo, that it was already bouncing, correct?

A. Yes.

Q. And you don't know what caused it to bounce?

A. I do not know.

* * *

Q. Lucy, I'm going to go back to this.

A. Yes.

Q. So, when you first saw that vehicle, it was already bouncing, correct?

A. Yes.

5

Q. And you don't know what caused it to start bouncing, correct?

* * *

A. I do not know what else would have caused it to bounce.

* * *

Q. And you don't know what caused it to bounce, true?

* * *

Q. True?

A. Okay. True.

* * *

A. I don't—I don't actually know. I am assuming it was the—I mean, why else would a car bounce? What would cause a car to bounce?"

Lucy was asked additional questions about whether the vehicle was in control, and she responded as follows:

"Q. Okay. So, let me, if I understand you correctly, you saw the car bouncing for 13, 14 seconds, is that correct?

A. Uh-huh. Yes.

Q. And it was in control?

A. It was—he was keeping it on his side of the road.

Q. Okay. So, keeping it in control on his side of the road?

A. Yes.

¶ 14    Roger Woodcock (Roger), an eyewitness, also provided a voluntary written statement to investigating officers. In his statement, he recalls being a passenger in a Ford 150 pulling a trailer with his wife, Lucy, as the driver, traveling south on 600 East on July 6, 2020. Just as they were

6

coming to the top of a hill, he observed a car traveling north on 600 East toward them. He estimated the vehicle was approximately 50 yards away from them when he first saw it. He immediately noticed the back wheels were bouncing, and it looked like the driver "was going to lose control of his vehicle." It appeared that the "bouncing wheels" were making the car head towards their vehicle. They pulled off on the side of the road believing the car was going to hit the trailer, but it did not. As the vehicle passed, Roger observed a younger male was driving the vehicle. He could not give an estimate of the vehicle's speed. After they had completely stopped, he exited his vehicle and observed the Monte Carlo crash into a tree.

¶ 15    Roger knew that "the road in the area where I first observed the car was bad," so it did not surprise him that the back tires were bouncing. He described the road as being "washboard." He had previously almost lost control of his vehicle in the same area. He stated that "[t]he area in which [he] had almost lost control of [his] vehicle is the exact area in which [he] first observed the car traveling towards [them]." He had "no doubt" that the bumps in the road caused the car's back wheels to start bouncing and the driver to lose control of the car.

¶ 16    During Roger's deposition, the following statements were made regarding what he had observed:

> "Q. And you stated the car was about 50 yards to the south of you when you first observed it, correct?
>
> A. Right. Yep.
>
> Q. And then when you saw the car, what did you notice about its back wheels?
>
> A. They was [*sic*] bouncing. I could see it was losing control.
>
> Q. And was this in the portion of the road that you knew there was something unusual about the condition of the road?

7

A. Yes.

Q. What was that?

A. It was like a washboard.

* * *

Q. And then were you, as the car continued going north, did it appear that it began to lose control?

A. Yes. And it was headed toward us.

* * *

Q. And you—would you describe the road as being a washboard where you saw the tires bouncing?

A. Yeah, it was a bunch of bumps right in a row. So that's what made the car start bouncing."

¶ 17 Sergeant Jeffrey Vercler offered testimony by way of deposition. He testified he was a sergeant with the Champaign County Sheriff's Department and had been employed in that capacity for 11 years. He testified he has been working for the department for over 27 years and has investigated hundreds of traffic accidents in his career. On July 6, 2020, he participated in the investigation of the crash and conducted his own investigation on July 14, 2020, for the specific purpose of documenting any road defects that existed. Approximately 800 to 1000 feet south of the crash site, and more pronounced in the 850-to-950-foot area, he observed the roadway to have a washboard effect. He testified he was familiar with 600 East having driven it for over 25 years and knew it to have defects. He described that particular portion of the road as a "very rough area."

8

¶ 18    When asked if, based on his education, training, and experience as a police officer for 27 years, he had an opinion whether the road conditions of 600 East contributed to the accident, he responded:

> "A. I'll tell you straight out. I can break this down real easy. The road is bad. It's really bad in that spot, and he was going too fast, okay? He didn't wreck prior to that. He was going fast. He hit that spot, and he crashed. It's as simple as that."

He further testified that, based on his experience, it is his opinion that the vehicle "most likely" lost control when it hit the portion of 600 East with the washboard defect. He testified that the speed of the vehicle and the road condition were both factors that contributed to the crash and he did not think that "one happens without the other." Lastly, he stated, based on his experience investigating vehicle crashes and observing the damage to the vehicle in this case, he believed the vehicle was traveling at a speed between 85 to 100 miles per hour.

¶ 19    Deputy Daniel Fromm also gave testimony by deposition. He testified he was a patrol deputy for the Champaign County Sheriff's Department and had investigated the crash on July 6, 2020. He testified he helped take measurements of the crash, which included measurements of the roadway, vehicle debris, damage to a fence, tire track marks, and defects in the roadway. He documented these observations in his field report and generated a traffic crash report and diagram. He testified that he believed the road defects to be substantial, and that the Monte Carlo traveled over the defects prior to the crash. His opinion, based on his training and experience, was that the roadway was a contributing factor to the crash due to its "imperfections, the conditions of the roadway, the washboard, and the bumps." The location of the washboard was consistent with the location where the Woodcocks observed the vehicle bouncing vertically.

9

¶ 20    Condit Township Highway Commissioner Ronald Scudder testified by deposition that his duties as highway commissioner included inspecting and maintaining the roadways in a reasonably safe condition. Scudder testified that every road in his jurisdiction was traveled and inspected at least "once a week," which included 600 East. Prior to the accident, 600 East was resurfaced with oil-and-chip in 2013 and 2018 and received other maintenance in 2017. He testified 600 East has a statutory speed limit of 55 miles per hour, and he is "fully aware" that people "drive faster than what the state says it's supposed to be driven." In addition, he agreed that it is quite common for vehicles to travel in excess of 55 miles per hour on township roads, including 600 East. Scudder testified that it is possible that a washboard effect on a roadway could affect the ability of an individual to control their vehicle.

¶ 21    After the incident, based upon his inspections of the roadway and his judgment, Scudder considered 600 East to be properly maintained. Specifically, he testified that he disagreed with Sergeant Vercler's incident report that documented a washboard defect in the road 800 to 1000 feet south of the crash site, and Scudder opined that "the road was safe and the defects were not there." Further, he testified that he did not believe the condition of the roadway was a contributing factor in causing the accident.

¶ 22    Kevin Johnson, plaintiffs' expert witness, also offered testimony by way of deposition. He testified he had a degree in biochemistry from the University of Missouri Columbia and was certified as an accident reconstructionist through the Accreditation Commission for Traffic Accident Reconstruction (ACTAR). He testified that he has approximately 30 years of experience, 10 years working as a police officer for the traffic unit handling serious injury and fatal crashes and 20 years in the private sector as an expert in civil litigation. Johnson testified that he had

reviewed the depositions and materials associated with the case, performed fieldwork at the crash site, and generated a report.

¶ 23 Defense counsel asked Johnson whether he agreed that there was no eyewitness testimony about the vehicle initially losing control, and he responded:

> "A. I don't know that I exactly agree with you on that, because you have a period of time where there's some vertical moments to it, basically where the vehicle is bouncing up and down, and apparently, it's still traveling straight down the roadway. And then as that was exacerbated, then you have a loss of control that occurs after that."

Johnson further testified that when the Woodcocks first observed the vehicle it was already bouncing, and that there is no physical evidence or testimony regarding when or where the vehicle first began to bounce. He testified that the Woodcocks' testimony is related to where the washboarding effect occurs and is consistent with the vertical element of the vehicle bouncing.

¶ 24 Further, Johnson gave the opinion that the washboard defect just south of the crest of the hill caused the vehicle to "begin to lose control." When asked the basis for his opinion, Johnson responded that the geometry of the roadway and the washboard defect present in the roadway combined with the witnesses' description of the vertical bouncing nature of the vehicle formed the basis of his opinion.

¶ 25 Johnson agreed that a multitude of reasons exist for why a driver can lose control of a vehicle, *e.g.*, driver inattentiveness or error, but explained that the vertical bouncing of the vehicle described by the Woodcocks is "not possible through those methods." He further explained that "the only method that's present in this area is that vertical loading/unloading due to the defect in the roadway." The following exchange then occurred:

"Q. I'm not talking about what the witnesses saw. I'm talking about before when the witnesses couldn't see the vehicle. There's a multitude of reasons that this Crowe vehicle could have lost control on 600 East that day; correct?

\* \* \*

A. I got your question. So prior to this, had there been a loss of control, there are many things that could cause a loss of control beforehand. We wouldn't know of those. But in terms of the description of the vertical element, that's what really gets into the washboard effect. If there's something else out there—vehicle travels off the roadway, off the shoulder, goes to pick something up, loses control that way—we're going to see a different outcome than what we see with this vertical element. If we didn't have a witness coming the other direction that said they saw this bouncing all over the place, I don't know that we would have a basis for that. So when you said is my basis the witnesses? Absolutely."

¶ 26    When asked whether the vehicle could have initially lost control for some reason other than the road, and then the roadway surface caused that already out-of-control vehicle to bounce, Johnson responded:

"A. It's in the realm of possibility that that could occur. But then the extended loss of control with the vertical element not being able to regain the control is what we've been discussing here today."

¶ 27    Ultimately, Johnson's opinion to a reasonable degree of scientific certainty was that the washboard defect was the only possible cause of the vertical bouncing described by the Woodcocks. Other hypothetical causes for a loss of control do not explain the vertical bouncing. Further, in the absence of any evidence or indication that the vehicle lost control prior to

12

encountering the washboard defect, the washboard defect caused the initial oscillation which was exacerbated by "the harmonics with the speed associated with it," and caused the loss of control. Lastly, he opined that had the vertical loading and unloading not occurred, "most likely" the loss of control would not have followed.

¶ 28 Dr. Jay Przybyla, plaintiffs' retained expert witness, also testified by deposition. Przybyla is a licensed professional engineer with experience, education, and training in the fields of civil engineering, forensic engineering, and transportation safety. He testified that he was certified as an accident reconstructionist through ACTAR. He earned a bachelor of science degree in civil engineering from Brigham Young University and a Doctor of Philosophy degree in transportation engineering from the University of Utah. He was retained by the plaintiffs to offer expert road engineering opinions and did not perform an accident reconstruction.

¶ 29 Przybyla testified that he had reviewed the depositions and materials associated with the case, visited the crash site prior to his deposition, and generated a report. He testified that 600 East was not properly maintained and there existed a severe pavement distress in the form of corrugation or washboarding. He disagreed entirely with Scudder's characterization of the condition of the roadway. Przybyla testified that to a reasonable degree of scientific certainty there is a correlation between the washboard defect and the vertical dynamics of the vehicle that were observed. He explained that the washboard defect was a contributing factor to the initial loss of control. He testified he could not pinpoint the exact location where the initial loss of control occurred, but that it was in the area with severe corrugation or washboard effect as described by the Woodcocks. He testified that the speed of the vehicle would also be a contributing factor, but that he had not formed an independent opinion as to the speed. Ultimately, Przybyla's opinion to a reasonable degree of scientific certainty was that the condition of 600 East was not reasonably

13

safe, and the washboard defect was a contributing factor to the vehicle's initial and continued loss of control.

¶ 30    On August 31, 2023, the Township defendants filed a motion for summary judgment on counts II and III based on the issues of proximate cause and tort immunity[3] and argued that the plaintiffs could not establish a genuine issue of material fact. The Township defendants asserted that there is no evidence establishing what caused defendant Crowe to lose control of the vehicle, because (1) neither Crowe nor Emily have an independent recollection of the events prior to, during, or after the crash, and (2) the Woodcocks did not see the vehicle before it was already bouncing and out of control. Thus, one could only speculate as to what caused the loss of control, and mere speculation is not sufficient to establish proximate cause and survive summary judgment. The Township defendants additionally asserted that "the roadway was nothing more than a *condition* making Emily Cohoon's injury possible, not a *cause*," because defendant Crowe's negligent operation of the vehicle was not foreseeable and served as a subsequent, intervening act of a third party. (Emphases in original.)

¶ 31    Plaintiffs filed a response to the motion for summary judgment and asserted that there existed a genuine issue of material fact as to whether the washboard defect caused Emily's injuries. The plaintiffs disputed the defendants' characterization of the evidence in the case, and specifically the Woodcocks' testimony that the vehicle was already out of control when it was first observed. The plaintiffs claimed, *inter alia*, that the Woodcocks' testimony (1) established that the initial loss of control was in the area of the washboard defect and (2) was sufficient circumstantial evidence to support a reasonable inference that the condition of the roadway was a material element and substantial factor in bringing about the injury. In addition, the plaintiffs argued that

---

[3]The facts encompassing the tort immunity issue will be addressed in our analysis below as needed.

the roadway did not merely furnish a condition which made plaintiff's injury possible, but was a legal cause in that Crowe's negligent operation of the vehicle was not so extraordinary as to render it unforeseeable. Further, plaintiffs argued that there can be more than one cause of plaintiff's injury, and that Crowe's negligent driving would not serve as a superseding, intervening act under the circumstances.

¶ 32    The Township defendants filed a reply to the response to the motion for summary judgment and reasserted that summary judgment must be granted because there is no evidence of defendant Crowe's driving at any time before the Woodcocks observed him already out of control. Defendants argued that in order to establish the washboard defect caused the loss of control, the plaintiffs must first establish he was in control before the washboard area. In addition, the Township defendants maintained that they had not argued that defendant Crowe's loss of control was an "intervening efficient cause" that broke the causal chain. But rather, there is no evidence as to when or where Crowe first lost control of the vehicle, or what caused him to lose control. And that the excessive speeding by Crowe is what led to the vehicle striking the tree, and there is no evidence that absent striking the tree, Emily would have sustained any injury. Thus, the washboard was nothing more than a condition that made the injury possible.

¶ 33    On October 17, 2023, the circuit court held a hearing on the motion. The Township defendants argued that (1) when the Woodcocks first observed the vehicle it was already bouncing and out of control, (2) there is no evidence as to what took place prior to the Woodcocks observing the vehicle, and (3) the plaintiffs must demonstrate control at a point prior, to establish the washboard caused the vehicle to lose control. The defendants further argued that there is an infinite number of possibilities that could have caused the vehicle to lose control, and that lack of evidence can only be filled by speculation.

15

¶ 34 The plaintiffs argued that the eyewitness testimony of the Woodcocks and the experts' opinions is sufficient to raise a genuine issue of material fact as to proximate cause. The plaintiffs asserted that defendants' position that when the Woodcocks first observed the vehicle was "already out of control" misstates their testimony. Instead, the Woodcocks first observed the vehicle bouncing and it continued in its lane on a path of losing control and that the initial cause of this was the washboard effect. Plaintiffs argued that the Woodcocks' testimony combined with the experts' opinions that the only possible cause of the vertical bouncing was the washboard effect raised a genuine issue of material fact and is not based on speculation at all. Further, they argued that there is no evidence that the vehicle ever left the roadway or was already out of control before the vehicle encountered the washboard effect. The Woodcocks observed the vehicle in its proper lane on the roadway coming north and the vehicle began bouncing in the area where there is a washboard. Thus, the circumstantial evidence in the case and the reasonable inferences that can be drawn are sufficient to defeat a motion for summary judgment. In addition, they argued that proximate cause is not limited to only one cause, and here, the vehicle's speed and the washboard defect were the two causes.

¶ 35 Toward the end of the hearing, the following exchange took place between the circuit court and defense counsel:

> "THE COURT: Well, you're the movant at summary judgment here. And I understand that it's their claim to prove. But here, you know, your—the question to you is absolutely if we just had a car wrapped around a tree, that's not enough, you win on summary judgment.
>
> Absolutely if we just have a car wrapped around a tree and there's some washboarding nearby, you have summary judgment.

16

But we have—what we have here is one more fact which is we have a car wrapped around a tree, a washboarding effect, and then we have people who said the car was doing something that would indicate it was being acted upon by a washboard effect.

So why isn't that enough? And if that's not enough, what is the—what is the thing that they're missing?

MS. SHELLY [Counsel for Township defendants]: They can't demonstrate that that vehicle was ever in control. And their inability to do that means they can't demonstrate what caused it to lose control. And that means they can't demonstrate that any action with respect to the surface of the roadway was a proximate cause of Emily Cohoon's injuries."

The circuit court took the motion under advisement.

¶ 36 On December 12, 2023, the circuit court entered a written judgment granting the defendants' motion for summary judgment on the issue of proximate cause and denying summary judgment on the issue of tort immunity. As to proximate cause, the circuit court found:

"[A] trier of fact cannot know whether Crowe was in control of the vehicle before the washboard section of C.R. 600E, only that he was significantly speeding, probably traveling in excess of 70 miles per hour, and that the vehicle experienced vertical forces from the washboard that caused the vehicle to bounce as it traveled. Whether the washboard effect caused him to lose control or whether it simply contributed to Crowe's inability to regain control is unknowable on this factual record."

The circuit court determined that without Crowe's testimony or an eyewitness who saw the vehicle in control prior to the washboard defect, one is left to speculate as to what caused the vehicle to lose control, and there are a number of possibilities, *e.g.*, excessive speed, distraction, or even deliberate recklessness, that cannot be ruled out on this factual record. The circuit court explained,

17

"we do not have any information about the Monte Carlo immediately before it lost control and cannot say without guessing where it lost control." Further, the circuit court found that without clear causal evidence about the condition of the vehicle prior to the Woodcocks' observations, "C.R. 600E is at most a condition and not a cause of Emily's injuries." It then determined that a trier of fact would be incapable of distinguishing "between a condition and a cause in the absence of any evidence about the Monte Carlo's condition prior to the Woodcock's [*sic*] view of it." The circuit court found that the plaintiffs were unable to create a genuine issue of material fact sufficient to survive the motion for summary judgment because neither the circumstantial evidence of record nor the reasonable inferences drawn therefrom can eliminate the speculation required in determining whether the vehicle was in control prior to encountering the washboard. The circuit court therefore granted summary judgment for the defendants on the issue of proximate cause.

¶ 37     On January 5, 2024, the circuit court entered an agreed order pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) regarding its ruling on the Township defendants' motion for summary judgment. This appeal timely followed.

¶ 38                                    II. ANALYSIS

¶ 39     On appeal, the plaintiffs-appellants argue the single issue of whether the circuit court erred in granting the Township defendants' motion for summary judgment and finding no genuine issue of material fact existed on the issue of proximate cause.

¶ 40     Before addressing the issue of proximate cause, we first turn to whether we have jurisdiction to address the issue of tort immunity. In the Township defendants' response brief on appeal, they set forth the alternative argument that the circuit court erred in denying their motion for summary judgment on the affirmative defense of tort immunity and assert they are entitled to absolute immunity pursuant to sections 2-201 and 2-109 of the Tort Immunity Act (745 ILCS 10/2-

18

201, 2-109 (West 2020)). In the plaintiffs' reply brief, they argue that issue was not raised by the plaintiffs' opening brief and the defendants have waived the right to challenge that portion of the circuit court's order by failing to file a cross-appeal.

¶ 41    "Where a general decision for the appellee contains findings unfavorable to the appellee and no cross-appeal is filed, the adverse findings are not properly before the reviewing court." *Cincinnati Insurance Co. v. Chapman*, 2016 IL App (1st) 150919, ¶ 27 (citing *Cleys v. Village of Palatine*, 89 Ill. App. 3d 630, 635 (1980)); accord *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387 (1983) (findings of the trial court adverse to the appellee require the appellee's cross-appeal if the judgment of the trial court was at least in part against the appellee).

¶ 42    Because defendants failed to file a cross-appeal concerning the circuit court's finding that immunity under the Tort Immunity Act did not apply, the issue is not properly before this court and we will not consider it.

¶ 43    We now turn to the issue of proximate cause on appeal. The circuit court granted summary judgment because it found that the plaintiffs could not establish that the vehicle's loss of control was proximately caused by any negligence of the Township defendants. It determined that the lack of evidence regarding whether the vehicle was in control prior to the washboard defect precluded plaintiffs from demonstrating the washboard effect caused or contributed to the loss of control and Emily's subsequent injuries. Thus, a trier of fact is left only to speculate as to what caused the initial loss of control, and the "only fact that can actually be counted in plaintiffs' favor at summary judgment is that the already-out-of-control Monte Carlo experienced vertical forces from ruts in the road known as washboarding, which inferentially may have made regaining control of the vehicle more difficult."

19

¶ 44   It is important to note that the parties heavily disagree on the inferences that can be drawn from the evidence and deposition testimony in the case. For example, the prevailing and main dispute is whether the vehicle was already out of control when first observed by the Woodcocks. The defendants argue and cite deposition testimony they claim support the vehicle was already out of control, while the plaintiffs argue that the defendants intentionally omit testimony that supports the opposite. This theme continues throughout the issues in the case and revolves around the observations and testimony of the Woodcocks. As a result, we have included a detailed recitation of the facts surrounding these issues in our background section above. However, the central issue is whether the Woodcocks' observations of the crash and their subsequent testimony are sufficient to raise a genuine issue of material fact regarding proximate cause in the case.

¶ 45   The plaintiffs argue in their brief on appeal that there is sufficient evidence in the case to create a genuine issue of material fact on the issue of whether the washboard defect in the roadway proximately caused Crowe to lose control of his vehicle and injure Emily Cohoon. They assert that the personal observations and testimony of the Woodcocks, when properly construed, present sufficient direct and circumstantial evidence to support a reasonable inference that the washboard defect caused the initial loss of control. Additionally, they argue the independent opinion testimony of the officers who investigated the crash and the experts' opinions in the case all concluded that the washboard caused the loss of control and were supported by reasonable inferences from the facts.

¶ 46   Further, the plaintiffs contend that defendants' argument that Crowe had already lost control of the vehicle before the Woodcocks first saw it is entirely speculative itself. They argue that there is no evidence that suggests the vehicle was out of control before it encountered the washboard. Thus, the lack of any such indication should be an inference drawn in favor of the

20

plaintiffs for the purposes of summary judgment. In addition, Johnson testified that if there was some other hypothetical loss of control, there would be a different outcome than what was observed by the Woodcocks. Thus, a trier of fact could reasonably infer from the testimony of the Woodcocks combined with the expert's opinion that the vehicle was in control before the washboard, that it began to bounce in the washboard area, and then the loss of control occurred. Moreover, Johnson testified plainly that the vehicle began losing control after it began bouncing and that the washboard is the only possible cause for the vertical bouncing.

¶ 47    Lastly, the plaintiffs argue that there is sufficient evidence in the case, beyond mere speculation, to establish that the washboard defect was at least a cause of the collision and Emily's subsequent injuries. The evidence establishes far more than the simple fact that an accident occurred, and the reasonable inferences drawn from the evidence are not based on speculation but from the personal observations of the Woodcocks. The plaintiffs assert they have provided substantial evidence to support that (1) there existed a washboard defect on 600 East, (2) the washboard defect can affect a driver's ability to control a vehicle, (3) the washboard can cause a vehicle to bounce, (4) the vehicle was bouncing in the area where the washboard exists, (5) the vehicle was otherwise under control when it was observed bouncing, and (6) there is no other probable explanation for the bouncing. Thus, summary judgment was improperly granted under the circumstances.

¶ 48    The Township defendants argue on appeal that summary judgment was properly granted because (1) the plaintiffs failed to present facts sufficient to establish the element of proximate cause, (2) proximate cause cannot be premised upon speculation, conjecture, or guess, and (3) the alleged washboard defect did nothing more than furnish a condition that made the crash possible. They assert that there is no evidence to establish when defendant Crowe was in control of the

21

vehicle. Thus, the plaintiffs can never present a triable issue of fact as to whether Crowe lost control due to the alleged washboard defect, because they cannot eliminate the "other myriad of possibilities" that could cause a loss of control unrelated to the surface of 600 East. In addition, they argue that the evidence is undisputed that the vehicle was already out of control when it was first observed by the Woodcocks, and that the plaintiffs only now on appeal argue that the vehicle was in control when it was first observed. The Township defendants assert that plaintiffs' attempt to distinguish between the vehicle "bouncing" and the vehicle "beginning to" or being in the process of "losing control" is a distinction without a difference.

¶ 49    They also argue that Crowe and Emily have no recollection of the events, and the only witnesses that exist can only comment on a portion of the relevant evidence as the Woodcocks did not see the vehicle before it was bouncing and already out of control. The Woodcocks can only speculate as to what occurred prior to them observing the vehicle crest the hill. Thus, "the fatal flaw in Plaintiff's case is that there is *no other evidence* upon which liability could be premised against Condit Township that is not purely speculative as to the operation of the Monte Carlo before the Woodcocks observed it 'bouncing.' " (Emphasis in original.) Additionally, the Township defendants argue that the plaintiffs "cannot create a question of fact whether 600 East was a 'cause' of the crash, rather than simply a 'condition' which permitted the crash to occur," because they cannot demonstrate evidence of Crowe's driving and the condition of the vehicle before the Woodcocks observed it crest the hill. They assert that 600 East was at most a condition making Emily's injuries possible, not a cause, and that the subsequent, independent act of Crowe excessively speeding caused Emily's injuries. Thus, the subject roadway was a condition and not a proximate cause. Accordingly, the Township defendants claim the circuit court properly granted summary judgment in their favor.

22

¶ 50    "The purpose of summary judgment is not to try a question of fact but, rather, to determine whether a genuine issue of material fact exists." *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 14. A motion for summary judgment may be granted only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). In ruling on a motion for summary judgment, the trial court must consider the pleadings, depositions, and affidavits strictly against the movant and in favor of the opposing party. *Kolakowski v. Voris*, 83 Ill. 2d 388, 398 (1980). A triable issue precluding summary judgment exists where material facts are disputed or where the material facts are undisputed but reasonable persons might draw different inferences from the undisputed facts. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). Plaintiffs need only present evidence sufficient to show a genuine dispute about a factual issue; they "are not required to prove their case at the summary judgment stage." *Thompson v. Gordon*, 241 Ill. 2d 428, 438 (2011). Summary judgment "is a drastic means of disposing of litigation," and therefore it should be granted only when the movant's right to the relief "is clear and free from doubt." *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986). Our review of an order granting summary judgment is *de novo*. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 390 (1993).

¶ 51    Proximate cause has two components: cause in fact and legal causation. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). When considering cause-in-fact, courts generally employ either the traditional "but for" test or the "substantial factor" test. *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 23. Under the "but for" test, "a defendant's conduct is not the cause of an event if the event would have occurred without it." (Internal quotation marks omitted.) *Id.* Under the "substantial factor" test, a defendant's negligence is a cause-in-fact if it was a material and

23

substantial factor in bringing about the injury. *Id.* Where reasonable minds could differ whether a defendant's conduct was a material and substantial factor in bringing about the injury is a question for the jury. *Lee*, 152 Ill. 2d at 455.

¶ 52    Legal cause involves an assessment of foreseeability. *Id.* at 456. An injury is foreseeable if a reasonable person would see it as a likely result of his or her conduct. *Id.* An injury is not foreseeable if it is so highly extraordinary that imposing liability is not justified. *Id.* Thus, foreseeability presents a policy question: "How far should a defendant's legal responsibility extend for conduct that did, in fact, cause the harm?" (Internal quotation marks omitted.) *Turcios*, 2015 IL 117962, ¶ 24.

¶ 53    The defendant's negligence need not be the sole cause of the plaintiff's injury; the defendant may be liable if his conduct contributed in whole or in part to the injury. *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 79. Proximate cause is ordinarily a question of fact for the jury. *Olson v. Williams All Seasons Co.*, 2012 IL App (2d) 110818 ¶ 25.

¶ 54    The plaintiff may establish proximate cause through circumstantial evidence. *Mann v. Producer's Chemical Co.*, 356 Ill. App. 3d 967, 974 (2005). That is, causation may be established by facts and circumstances that, in the light of ordinary experience, reasonably suggest that the defendant's negligence operated to produce the injury. *Id.* It is not necessary that only one conclusion follow from the evidence. *Id.* But a fact cannot be established through circumstantial evidence unless the circumstances are so related to each other that it is the only probable, and not merely possible, conclusion that may be drawn. *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 796 (1999).

¶ 55    The circuit court disregarded the Woodcocks' testimony and concluded that they were only able to speculate as to how and where the initial loss of control occurred because they did not

24

observe the vehicle prior to it encountering the washboard area. The circuit court further found that the plaintiffs were unable to create a genuine issue of material fact without such testimony, and any expert opinion that set forth the "theory" that the washboard defect was a cause of the loss of control and subsequent injuries would necessarily be based on the Woodcocks' "speculative" testimony. We disagree.

¶ 56 The plaintiffs were able to present more evidence than merely the occurrence of an accident. Although the Woodcocks cannot account for what occurred, if anything, prior to when they first observed the vehicle, their testimony is not speculative, but is a direct, personal account of the circumstances surrounding the incident. Lucy Woodcock's initial statement caught by an officer's body camera while still on the scene, immediately after the crash, and before any legal involvement provides: "We were comin' [*sic*] up over the hill, and the car, it was coming northbound, and it was jumping up and down probably because of the bumps. And it started fishtailing, and I had to get over into the ditch for it to miss me. And I looked in my driver's mirror and I seen [*sic*] it lose control and roll several times." This statement, while short and simple, summarizes exactly what she observed and is likely truthful and accurate based on the proximity in time it was made to the occurrence and being made on her own volition without any direction. She observed the vehicle bouncing likely from the washboard, the vehicle then began to fishtail, and then it lost control and crashed. From her eyewitness testimony combined with Kevin Johnson's expert opinion that the washboard defect is the only possible explanation for the vertical bouncing, a fact finder could reasonably infer that the washboard defect was *a* cause that initiated the vertical bouncing and sequence of events that led to the loss of control and the plaintiff's injuries.

25

¶ 57 In this case, the Woodcocks had personal knowledge of a washboard defect in the area where they observed the vehicle bouncing. That washboard defect was later observed and documented by multiple law enforcement officials. The Woodcocks observed the vehicle bouncing in that area and the plaintiffs' expert testified the vertical bouncing can only be caused by the washboard defect. The Woodcocks observed the vehicle continue to travel in its lane but bouncing, and then lose control immediately thereafter. The close proximity between the vehicle's passage through the washboard area and its crash is sufficient to, at the very least, create a genuine issue of fact about whether it crashed because of the washboard. In light of the Woodcocks' eyewitness testimony and viewing the evidence in the light most favorable to the plaintiffs, the plaintiffs presented sufficient circumstantial evidence that creates a genuine issue of material fact regarding proximate cause. Therefore, summary judgment for the defendant was improper.

¶ 58 In addition, the circuit court in its order relied on *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252 (1999), in finding that without clear causal evidence about what sent the speeding vehicle out of control or how out of control it was before the Woodcocks observed it, the washboard defect was at most a condition and not a cause of Emily's injuries.

¶ 59 Illinois courts draw a distinction between a condition and a cause. *Id.* at 257. Condition-versus-cause cases may be thought of as a subset of proximate cause case law. *Id.* at 259. The condition-versus-cause dichotomy is consistent with the two-prong definition of proximate cause, cause-in-fact and legal cause, set forth above. See *id.* at 257-59. Under both analyses, the question is whether the defendant's negligence was a material and substantial factor in bringing about the injury, and, if so, was the injury of a type that a reasonable person would see as a likely result of his or her conduct. *Id.* at 258-59.

¶ 60    If the defendant's negligence does nothing more than furnish a condition by which the injury is made possible, and such condition, by the subsequent independent act of a third person, causes an injury, then the two acts are not concurrent, and the creation of the condition is not the proximate cause of the injury. *Id.* at 257. An intervening efficient cause is a new and independent force that breaks the causal connection between the original wrong and the injury and itself becomes the cause of the injury. *Id.* The test is whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence. *Id.*

¶ 61    Here, we acknowledge that the circuit court's order indicates that it determined that the condition of 600 East was at most a condition, not a cause; however, we are unable to find anywhere in the order where it explicitly finds that a subsequent, intervening act of a third person broke the causal chain and became the sole proximate cause. In this case, the only possible intervening act would be defendant Crowe's driving the vehicle in excess of the statutory speed limit. But no such finding is in the circuit court's order. Instead, it relies on the lack of evidence and speculative nature of the Woodcocks' testimony regarding the initial loss of control. Further, there is no discussion in the circuit court's order regarding the foreseeability of such an intervening act.

¶ 62    The "condition vs. cause" approach does not end with the identification of an intervening cause. Instead, consideration must be given as to whether "the first wrongdoer might have reasonably anticipated the intervening cause as a natural and probable result of the first party's own negligence." *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 317 (1942). Only if the third party's act is "the immediate cause of the injury and is such as in the exercise of reasonable diligence would not be anticipated and the third person is not under the control of the

27

one guilty of the original wrong, the connection is broken and the first act or omission is not the proximate cause of the injury." *Id.* An intervening act will not break the chain of legal causation "if the intervening act was itself probable, or foreseeable by the first wrongdoer." *Green v. Welts*, 130 Ill. App. 2d 600, 604 (1970). "To escape liability, defendant must demonstrate that the intervening event was unforeseeable as a matter of law." *Mack v. Ford Motor Co.*, 283 Ill. App. 3d 52, 57 (1996). In determining whether an intervening act was foreseeable, "the precise nature of the intervening cause need not be foreseen [citation], and where varying inferences are possible, foreseeability is a question for the jury." *Id*.

¶ 63     On appeal, the Township defendants contend that it was not reasonably foreseeable that defendant Crowe would "drive up to 84 miles per hour on 600 East and fail to exercise reasonable care" in operating the vehicle. The gist of defendants' argument is that negligent driving breaks the causal chain between the first defendant's negligence and the plaintiff's injuries "as a matter of law." Although defendants suggest that speeding on a country road without a posted speed limit is not foreseeable, we find it creates a genuine issue of material fact that should be decided by the trier of fact and not on summary judgment.

¶ 64     Foreseeability is not only an objective inquiry, but it is also context dependent. *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 71. Negligent driving is not some one-size-fits-all proposition or a talismanic phrase that will break every causal chain in every situation. *Kramer v. Szczepaniak*, 2018 IL App (1st) 171411, ¶ 56. Some courts have even held that "[i]t is common knowledge that some drivers of automobiles exceed the posted speed limit on public highways." *Huff v. Goldcoast Jet Ski Rentals, Inc.*, 515 So. 2d 1349, 1351 (Fla. Dist. Ct. App. 1987).

¶ 65    Here, the speed of the vehicle is unknown. The crash experts have calculated and given an opinion as to a range of speed the vehicle was likely traveling based on the tire marks in the roadway, path of travel, and damage to the vehicle. However, there are competing ranges among experts, but all agree the vehicle was traveling in excess of the statutory speed limit of 55 miles per hour. Further, defendant Scudder testified that he is "fully aware" that people "drive faster than what the state says it's supposed to be driven." In addition, he agreed that it is quite common for vehicles to travel in excess of 55 miles per hour on township roads, including 600 East. In light of all of this, including the conflicting evidence regarding the speed of the vehicle at the time of the accident, we find that there is a genuine issue of material fact regarding the actual speed of the vehicle and find that a trier of fact should be permitted to determine whether that speed was reasonably foreseeable or if it was a superseding, intervening act. Thus, the circuit court's order granting summary judgment on this basis was improper.

¶ 66                                    III. CONCLUSION

¶ 67    In light of the foregoing standards and considerations, we believe, after careful review of the record in a light most favorable to the plaintiffs, that there is sufficient circumstantial evidence to raise a genuine issue of material fact on the issue of proximate cause as alleged by the plaintiffs in their complaint. Therefore, we reverse the judgment of the circuit court of Champaign County and remand the matter for further proceedings.

¶ 68    Reversed and remanded.